422 A.2d 625

William J. BROPHY, Charles J. Charlesworth and Glenn
A. Baker, Appellants,

v.

PHILADELPHIA NEWSPAPERS INC., Sam S. McKeel, Creed
Black, Larry Eichel and "John Doe."

Superior Court of Pennsylvania.

Argued Sept. 11, 1979.

Filed Oct. 31, 1980.

Petition for Allowance of Appeal Denied Feb. 3, 1981.

Robert C. Brown, Jr., Easton, for appellants.

Joseph F. Roda, Philadelphia, for appellees.

Before SPAETH, HESTER and CAVANAUGH, JJ.

CAVANAUGH, Judge:

Appellants–plaintiffs, the Police Commissioner of Potts-ville and two police officers, appeal from the order of the lower court granting summary judgment for appellees–de-fendants, the Philadelphia Newspapers, Inc. and various of its employees. Appellants had initiated an action in libel seeking to recover compensatory and punitive damages al-legedly sustained as a result of a defamatory article publish-ed by appellees in the Philadelphia Inquirer on May 18, 1975. The story concerned the roles played by appellants in the fatal shooting of a sixteen year old youth who allegedly was about to commit a robbery and the community's reaction to the incident. Appellants allege that the headline and the article erroneously indicated that some residents of Potts-ville believed the shooting was committed intentionally as a result of a long–standing political feud between the victim's father, Police Chief Thomas Quirk, and appellant police commissioner. The trial court held that the article was a neutral and accurate report of public officials acting in their respective official capacities, and it was published without malice and was not, as a matter of law, defamatory. In this appeal, appellants contend that the entry of summary judg-ment was erroneous because the article and headline were capable of a defamatory meaning and a genuine issue of fact

existed as to whether the article and headline were published with "actual malice."

The facts are as follows. On May 10, 1975, at approximately 10:30 o'clock in the evening, the police commissioner of Pottsville, William J. Brophy, received information from the State Police that Stephen Quirk, son of the Chief of Police, and another youth were armed with shotguns and knives and planned to rob a diner that evening. Appellant Brophy summoned officers Charles J. Charlesworth and Glenn A. Baker to his home and organized a stakeout of the diner. Appellants concealed themselves in the woods behind the diner. Shortly after midnight, two youths armed with rifles appeared and paused behind a garbage bin. The Quirk boy spotted appellant Charlesworth and allegedly pointed his rifle at the officer. Appellant Charlesworth, approximately seven feet away, fired his shotgun and fatally injured young Quirk.

On May 25, 1975 the Philadelphia Inquirer published an account of this incident and the community's reaction to the shooting. The article was entitled, "A Killing in Pottsville: Reform or Vendetta?" The article began as follows:

POTTSVILLE, Pa.–Early last Saturday morning, a policeman in this old central Pennsylvania coal town shot to death a youth who police say was about to commit a robbery.

The suspect, Stephen Quirk, 16, was the first person in at least 25 years to be killed by the police in Pottsville, a decaying mountainside town of 20,000 where crime–free days are the rule and police go for weeks without hearing of so much as a burglary.

He was also the son of Pottsville's police chief, Thomas Quirk.

What is even more remarkable about the shooting is that there are people in this town who suggest that it was no accident. They say it was the logical, albeit extreme, extension of a dispute that has been tearing the 30–man police department apart for 18 months.

"It was an ambush," said George Lindsay, the attorney for Chief Quirk.

The article then disclosed that the incident was a major topic of conversation among local residents who debated whether the police had used good judgment in attempting to catch the youths in the act of robbing the diner. The article continued:

The other talk–the talk of conspiracy–focuses not on Patrolman Charles Charlesworth, the man who apparently pulled the trigger, but on Police Commissioner William Brophy, who planned the police action that ended in the fatal shooting.

"It was Brophy and three of his hand–picked men who went out there," said Gary DeWitt, 29 who runs the Dairy Queen out on Route 61. "It's just my opinion, but there has to be more to this."

The article then revealed that appellant Brophy was an outsider who was hired by the previous mayor to reform the allegedly inefficient and corrupt Pottsville police force. The article outlined the tensions between appellant Brophy and Chief of Police Quirk who reportedly resented the new programs instituted by appellant Brophy. No mention was made of Appellant Baker and appellant Charlesworth was only referred to as the officer who shot the youth. The article mainly discussed appellant Brophy and his relationship with the community and certain elements of the police force.

## I.

█ In Pennsylvania, it is the function of the trial court, in the first instance, to determine whether the communication complained of is capable of a defamatory meaning. If the court determines that the statement is capable of a defamatory meaning, it is for the jury to decide whether it was so understood by the recipient. *Corabi v. The Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971); *Cosgrove Studio and Camera Shop Inc. v. Pane*, 408 Pa. 314, 317–18, 182 A.2d 751, 753 (1962); *Vitteck v. Washington*

*Broadcasting Co.,* 256 Pa.Super. 427, 431–32, 389 A.2d 1197, 1199 (1978). See Restatement 2d, Torts § 614.

■ "A libel is a maliciously written or printed publication which tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule or injure him in his business or profession." *Cosgrove Studio and Camera Shop, Inc. v. Pane, supra,* 408 Pa. at 317, 182 A.2d at 753; *Vitteck v. Washington Broadcasting Company, supra,* 256 Pa.Super. at 432, 389 A.2d at 1200. False imputations of criminal activity or intentions as alleged in the instant case clearly can damage a person's reputation and standing in the community. See, *e. g., Corabi v. Curtis Publishing Company, supra; Fox v. Kahn,* 421 Pa. 563, 221 A.2d 181 (1966); *Fegley v. Morthimer,* 204 Pa.Super. 54, 202 A.2d 125 (1964).

■ To ascertain the meaning of a defamatory communication, it must be read in context. *Corabi v. Curtis Publishing Company, supra,* 441 Pa. at 444, 273 A.2d at 906.

The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them.

*Id.,* 441 Pa. at 447, 273 A.2d at 907, quoting *Boyer v. Pitt Publishing Co.,* 324 Pa. 154, 157, 188 A. 203, 204 (1936).

■ Appellants argue that the use of the terms, "vendetta," "conspiracy," "no accident" and "ambush," give the reader the impression that appellants intentionally conspired to kill Stephen Quirk because of a feud between appellant Brophy and the deceased boy's father. Read together, these remarks reasonably could be interpreted as an accusation against appellants of intentionally harming the Quirk boy because of his father's animosity toward appellant Brophy.

■ The headline, "A Killing in Pottsville: Reform or Vendetta," could reasonably lead a reader to believe that a feud may have been the cause of the killing. The article begins with a description of the fatal shooting and then

states that some residents of Pottsville thought that the shooting was "no accident" which indicates that the shooting was done intentionally. The next sentence links the shooting to a dispute in the police department. Attorney George Lindsay's quote, "It was an ambush," further strengthens the image of an intentional killing. Several paragraphs later, the article discloses that the citizens discussed whether the police used good judgment in their attempt to apprehend the youths. The author then wrote about the "other talk–the talk of a conspiracy" and quotes a resident as saying that Brophy went out with "three of his hand–picked men" and that "there has to be more to this." From these statements, a person could deduce that the intentional shooting mentioned earlier in the article was the end product of a conspiracy among appellants motivated by a dispute between Brophy and some members of the police force. We recognize that this article could be given a different, less offensive interpretation. Indeed, the author testified that it was not his intention to imply that some residents considered appellants guilty of criminal acts. Nevertheless, neither the mere susceptibility of an article to an interpretation which would render it innocuous nor the intention of the author conclusively defeats a right of action for libel. *Corabi v. Curtis Publishing Company, supra,* 441 Pa. at 447, 273 A.2d at 906–907.

Therefore, because we cannot conclude that this publication is incapable of defamatory meaning, the granting of summary judgment on this ground would be inappropriate.

## II.

Since appellants are public officials, however, there can be no recovery unless and until they prove, with "convincing clarity," that the defamatory statements relating to their official conduct were made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See also Corabi v. Curtis Publishing Company, supra; Fox v.*

*Kahn, supra; Clark v. Allen*, 415 Pa. 484, 204 A.2d 42 (1964). Malice has been interpreted as "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Company v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967). What constitutes a reckless disregard of the falsity of a statement was clarified in *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968):

[C]ases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant, in fact, entertained serious doubt as to the truth of his publication. Publishing with such doubts shows reckless disregard to truth or falsity and demonstrates actual malice.

*Id.* at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267.

In the instant case, the lower court granted appellee's motion for summary judgment because it concluded that the article was an accurate and neutral news account and was not published with malice. No written opinion was filed to explain its reasoning.

### A.

■ We first must ascertain the standard for review of an appeal from the entry of summary judgment. Summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.C.P. No. 1035. In reviewing the record, the court must accept as true all well-pleaded facts in the non-moving party's pleadings, giving the non-moving party the benefit of all reasonable inferences to be drawn therefrom. Judgment can only be granted in cases clear and free from doubt. *Just v. Sons of Italy Hall*, 240 Pa.Super. 416, 368 A.2d 308 (1976); *Ritma-*

*nich v. Jonnel Enterprises, Inc.*, 219 Pa.Super. 198, 280 A.2d 570 (1971).

Appellees argue that some federal courts consider the granting of summary judgment the rule rather than the exception in public official libel actions. These courts hold, appellees contend, that at summary judgment the trial court is to make the initial inquiry into the existence of actual malice and that the plaintiff has the burden to prove actual malice with convincing clarity. *See Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir. 1970); *Wasserman v. Time, Inc.*, 138 U.S.App.D.C. 7, 424 F.2d 920 (1970) (Wright, J., concurring). As an indication that Pennsylvania courts share this view, appellees cited *Curran v. Philadelphia Newspapers, Inc.*, 261 Pa.Super. 118, 395 A.2d 1342 (1978), wherein Judge Spaeth, author of the Opinion in Support of Affirmance, comments:

In the normal case we are wary of summary judgment.... However, this is not the normal case, for it involves the first amendment; in such a case, summary judgment is a preferred procedure. In *Washington Post Co. v. Keogh*, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), the court said:

"In the First Amendment area, summary procedures are even more essential. For the stake herein, if harassment succeeds, is free debate.... Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self–censors. And to this extent debate on public issues ... will become less uninhibited, less robust, and less wide open, for self–censorship affecting the whole public is 'hardly less virulent for being privately administered.' *Smith v. People of State of California*, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959).

*Id.*, 125 U.S.App.D.C. at 35, 356 F.2d at 968.

*Id.*, 261 Pa.Super. at 126–27, 395 A.2d at 1346–47. [Footnote omitted.] Judge Spaeth, relying heavily on Judge Wright's

concurring opinion in *Wasserman v. Time, Inc., supra*, for-mulated a standard to be employed by the trial court in determining a motion for summary judgment in a public official libel case:

When a public official sues a newspaper for defamation, the court must on a motion for summary judgment make a threshold inquiry into actual malice: Unless the court finds on the basis of pretrial affidavits, depositions and documentary evidence that the plaintiff can prove actual malice in the *New York Times* sense, it should grant summary judgment for the defendant. . . . It is not enough for the plaintiff, in resisting summary judgment to argue that there is a jury question as to malice; he must make a showing of facts from which malice may be inferred. . . . Such an inference must be clear.

*Id.*, 261 Pa.Super. at 129–30, 395 A.2d at 1348. *See Bon Air Hotel, Inc. v. Time, Inc., supra; Wasserman v. Time, Inc., supra.* Thus, this view appears to vary from the normal summary judgment procedure in at least two ways. The trial court is not required to view the evidence in the light most favorable to the non-moving party and the trial court must make an initial determination as to whether the plaintiff can establish actual malice with convincing clarity. Using this standard, the Opinion in Support of Affirmance held that the plaintiff did not establish sufficient facts from which the trial court could clearly infer malice.

Judge Hester, author of the Opinion in Support of Reversal, found sufficient factual inconsistencies that warranted the submission of the issues to a jury. He urged the court to adopt the rationale that when there is a factual dispute as to the existence of actual malice, summary judgment is inappropriate. *See Curran v. Philadelphia Newspapers, Inc., supra*, 261 Pa.Super. at 148–49, 395 A.2d at 1357–58.

Initially, we note that since *Curran v. Philadelphia News-papers, Inc., supra*, was affirmed by an equally divided court, it is of no precedential value. *See: Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). We note further that the vitality of the view advanced by appellees,

that summary judgment is the rule rather than the exception in public official defamation cases, has been cast in doubt as a result of the United States Supreme Court's observation in *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979):

> Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule." The proof of "actual malice" calls a defendant's state of mind into question, *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964), and does not readily lend itself to summary disposition. See 10 Wright & Miller, Federal Practice and Procedure § 2730, at 590–592. *Cf. Herbert v. Lando* [441] U.S. [153], 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979)....

*Id.* at 120, n.9, 99 S.Ct. at 2680, n.9, 61 L.Ed.2d at 422, n.9. *See Church of Scientology of California v. Siegelman*, 475 F.Supp. 950 (S.D.N.Y.1979) *rehearing denied*, 481 F.Supp. 866; *DeRoburt v. Gannett Co., Inc.*, 83 F.R.D. 574 (D.Haw. 1979); *American Benefit Life Insurance Co. v. McIntyre*, 375 So.2d 239 (Ala.1979); *Nader v. deToledano*, 408 A.2d 31 (D.C.App.1979); *Berkey v. Delia*, 287 Md. 302, 413 A.2d 170 (1980); *National Association of Government Employees, Inc. v. Central Broadcasting Corp.*, —— Mass. ——, 396 N.E.2d 996 (1979).

■ While we recognize that summary judgment is "a proper vehicle" for disposing with potentially frivolous suits that threaten First Amendment freedoms, *see Bon Air Hotel, Inc. v. Time, Inc., supra*, we find that summary judgment should be granted only when warranted under Pa.R. C.P. No. 1035, i. e., where the evidence viewed in the light most favorable to the non–moving party, reveals an absence of a genuine issue as to the existence of actual malice as defined in *New York Times Co. v. Sullivan, supra*.

We believe that the language in *Guam Federation of Teachers, Local 1581, A.F.T. v. Ysrael*, 492 F.2d 438 (9th Cir. 1974) *cert. denied* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111, is particularly instructive:

The *standard* against which the evidence is to be examined is that of *New York Times* and its progeny. But the *manner* in which the evidence is to be examined in light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. [Emphasis in the original.]

*Id.* at 441. This standard was adopted by Chief Judge Newman of the District of Columbia Court of Appeals who, following an exhaustive discussion of the role of summary proceedings in public figure defamation cases, concluded:

Thus, while we agree that the First Amendment requires a public figure libel plaintiff to bear a heavier burden than is required for most other civil plaintiffs and concur in the underlying thesis of *Keogh* and *Wasserman* that the summary judgment proceeding may properly serve as a focal point for the resolution of libel actions, we are convinced that the special protection afforded press defendants in public figure libel actions does not necessitate a dilution of the Seventh Amendment by skewing the rules of judge and jury in summary judgment proceedings. It is engrained in American jurisprudence that the court may not resolve issues of fact or weigh evidence at the summary judgment stage in normal circumstances. We hold that the same principles applicable to normal summary judgment motions are applicable to such motions when made in a public figure libel action.

*Nader v. deToledano, supra* at 49–50.

Other jurisdictions are in accord. *See DeRoburt v. Gannett Co., Inc., supra; American Benefit Life Insurance Co. v. McIntyre, supra; Bandelin v. Pietsch*, 98 Idaho 337, 563 P.2d 395 (1977); *Cochran v. Indianapolis Newspaper, Inc.*, Ind. App., 372 N.E.2d 1211 (1978); *Howard v. Des Moines Register and Tribune Co.*, 283 N.W.2d 289 (Iowa 1979); *Berkey v. Delia, supra; National Association of Government Employees v. Central Broadcasting Corporation, supra.* *See also Dixson v. Newsweek, Inc.*, 562 F.2d 626 (10th Cir. 1977); *Peagler v. Phoenix Newspapers, Inc.*, 26 Ariz.App. 274, 547 P.2d 1074 (1976); *Dacey v. Connecticut Bar Association*, 170

Conn. 520, 368 A.2d 125 (1976); *Holter v. WLCY–TV, Inc.*, 366 So.2d 445 (Fla.App. 1978).

█ We find the rationale expressed by these courts persuasive and hold that a trial court confronted with a motion for summary judgment in a public official or figure defamation case must deny the motion if, viewing the evidence and all inferences arising therefrom in the light most favorable to the plaintiff, there appears a genuine issue of fact from which a jury could reasonably find actual malice with convincing clarity. Moreover, our conclusion is consistent with Pennsylvania case law. In *Corabi v. Curtis Publishing Co.*, *supra*, the Supreme Court discussed the standard to be employed when reviewing the granting by the trial court of a judgment n.o.v. in a public figure defamation case:

> Our task is to make an independent examination of the evidence adduced to determine if it was constitutionally sufficient to warrant a finding by the jury of actual malice, and in so doing, the evidence, together with all reasonable inferences therefrom, must be considered in the light most favorable to the verdict winner, here the plaintiff.

*Id.*, 441 Pa. at 458, 273 A.2d at 912. Thus, where a trial court takes the issue of actual malice from the jury, its obligation is not to make an initial factual determination of actual malice but to determine whether a reasonable jury could find actual malice viewing the evidence in plaintiff's favor. *Cf. Clark v. Allen, supra* (In a public official defamation action, the Supreme Court employed the traditional standard reviewing the granting of preliminary objections in the nature of a demurrer.)

### B.

The gist of appellant's argument is that the article falsely conveyed the impression that certain residents of Pottsville were of the opinion that the Quirk youth was shot intentionally by appellants pursuant to a conspiracy among appellants and that appellees published the article knowing that it did not accurately reflect the sentiments of the people of Potts-

ville. Appellants do not claim that the residents' criticism of the manner with which the police handled the stakeout was defamatory or false. It is clear that the residents' statements concerning the incident are protected constitutionally as opinions. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974). What is objected to is an allegedly deliberate and false impression or implication created by the author's interpretation of the opinions of the residents of Pottsville and by the manner in which he presented this material.

■ As previously noted, actual malice has been defined as a knowing falsehood or a reckless disregard of the truth or falsity of a publication. *New York Times, Inc. v. Sullivan, supra.* The rationale for this admittedly strict standard is the recognition that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' . . . ." *New York Times, Inc. v. Sullivan, supra*, 376 U.S. at 271–72, 84 S.Ct. at 721, 11 L.Ed.2d at 701. *See also Clark v. Allen, supra.* This constitutional protection extends to the "honest utterance, even if inaccurate" but not to the "calculated falsehood." *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964); *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 507 (3rd Cir. 1978). A showing of no more than negligence, carelessness, bad judgment or inaccuracy in the preparation and publication of an allegedly defamatory newspaper article is constitutionally insufficient to show the recklessness needed to prove actual malice. *New York Times, Inc. v. Sullivan, supra*, 376 U.S. at 287–88, 84 S.Ct. at 730, 11 L.Ed.2d at 711; *St. Amant v. Thompson, supra*, 390 U.S. at 731–32, 88 S.Ct. at 1325, 20 L.Ed.2d at 267; *Pierce v. Capital Cities Communications, Inc., supra* at 508, n.59.

■ Applying this standard to the instant case we fail to perceive sufficient evidence from which a jury could reasonably find actual malice. The record reveals that the reporter stated that he did not write the article with the intention of implying that the shooting was in any way intentional.

While mere professions of good faith are insufficient, *see St. Amant v. Thompson, supra,* 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267, the record is devoid of evidence from which one could infer a calculated or deliberate falsification. The reporter testified that, in choosing phrases such as "talk of a conspiracy" and "no accident," he accurately represented the views of a segment of the community, who thought that because of appellant Brophy's dispute with Chief Quirk, appellants mishandled the robbery incident and increased the risk of injury to the juveniles. It is noteworthy that the article does not purport to represent facts but only local opinion concerning the shooting incident. The reporter averred that he believed the opinions of the persons whom he quoted in the article. The opinions of these persons were corroborated by other townspeople and supported by his interviews with appellant Brophy and Chief Quirk's attorney.

Moreover, the reporter was selective in publishing the resident's opinions. For example, he did not use opinions from certain persons who characterized appellant Charlesworth as a "murderer" because he doubted the credibility of these persons. Had he wished to convey that appellants intentionally shot the Quirk boy, the reporter would have used these comments in his article.

Except for the arguably defamatory tone of the first page, the bulk of the article presented a fair account of appellant Brophy's tenure as police commissioner and the shooting incidents. The record does not disclose sufficient evidence from which a jury could infer that appellees engaged in "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Co. v. Butts, supra.*

■ The article in question reported on a number of opinions on a subject of local interest. Actual malice cannot be inferred solely because the information gathered by the reporter is presented in an ambiguous and potentially defamatory manner. *See Pierce v. Capital Cities Communica-*

*tions, Inc., supra* at 509. The reporter's introduction to his article may have been couched in strong or possibly sensational terms but such hyperbole without more does not give rise to an inference of actual malice. *See Greenbelt Cooperative Publishing Association, Inc. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). At the very most, the evidence supports a finding that appellees exercised bad judgment or were careless in preparing the article and its headline. As we noted earlier, mere negligence or inaccuracy cannot substitute for knowing falsehood or reckless conduct.

We have made an independent examination of the record, viewing the evidence in the light most favorable to appellant and discern no genuine issue of fact concerning actual malice. We conclude that the publication by appellees is protected by the First Amendment in accordance with the standards enunciated by the United States Supreme Court in *New York Times, Co. v. Sullivan, supra* and its progeny. Consequently, the lower court properly granted appellees' motion for summary judgment.

Affirmed.

SPAETH, J., files a concurring opinion.

HESTER, J., files a dissenting statement.

SPAETH, Judge, concurring:

I agree with Judge CAVANAUGH's conclusion that the order granting appellees' motion for summary judgment should be affirmed, but I arrive at that conclusion by somewhat different reasoning.

−1−

In *Curran v. Philadelphia Newspapers, Inc.*, 261 Pa.Super. 118, 395 A.2d 1342 (1978), an examination of the principles established by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny led to the following conclusion:

Applying these principles here, we conclude as follows: When a public official sues a newspaper for defamation,

the court must on a motion for summary judgment make a threshold inquiry into actual malice: Unless the court finds on the basis of pretrial affidavits, depositions, and documentary evidence that the plaintiff can prove actual malice in the *New York Times* sense, it should grant summary judgment for the defendant. *Bon Air Hotel, Inc. v. Times, Inc.,* [426 F.2d 858 (5th Cir. 1970)]; *Wasserman v. Time, Inc.,* [424 F.2d 920 (D.C. Cir. 1970)] (WRIGHT, J., concurring). It is not enough for the plaintiff, in resisting summary judgment, to argue that there is a jury question as to malice; he must make a showing of facts from which malice may be inferred. *Thompson v. Evening Star Newspaper Co.,* 129 U.S.App. D.C. 299, 394 F.2d 774 (1968). *Accord, Oliver v. Village Voice, Inc.,* 417 F.Supp. 235 (S.D.N.Y. 1976), *Meeropol v. Nizer,* 381 F.Supp. 29 (S.D.N.Y. 1974). *See also Bandelin v. Pietsch,* 563 P.2d 395 (Idaho, 1977), *cert. denied,* 434 U.S. 891, 98 S.Ct. 260 [266], 54 L.Ed.2d 177 (1977). Such an inference must be clear. *Cf. New York Times Co. v. · Sullivan, supra.*

261 Pa.Super. at 129–30, 395 A.2d at 1348 (opinion in support of affirmance, SPAETH, J., joined by VAN der VOORT, J., CERCONE, J., concurring in the result). I see no reason to retreat from this conclusion. Judge CAVANAUGH has taken issue with it in two respects, and my first reason for offering this opinion is to explain why I am not persuaded by what he says.

–a–

The first respect in which Judge CAVANAUGH takes issue with the conclusion expressed in *Curran* is that it "appears to vary from the normal summary judgment procedure [in that] [t]he trial court is not required to view the evidence in the light most favorable to the non–moving party . . . ." At 631. This interpretation of *Curran* is mistaken. I accept responsibility for the mistake, since I wrote the statement quoted by Judge CAVANAUGH; plainly, it was not as clear as it should have been. Let me therefore try again.

In *Curran* it is said that "[u]nless the court finds on the basis of pretrial affidavits, depositions, and documentary evidence that the plaintiff can prove actual malice in the *New York Times* sense, it should grant summary judgment for the defendant." 261 Pa.Super. at 129, 395 A.2d at 1348. This does *not* say—as Judge CAVANAUGH supposes—that the court is to view the "pretrial affidavits, depositions, and documentary evidence" in some light *other than* the light most favorable to the plaintiff as the non–moving party. To the contrary, the assumption in *Curran* was that the court *would* view the material before it in the light most favorable to the plaintiff, just as in any other summary judgment case.

That this was the assumption in *Curran* is apparent from the cases there cited, which were *Bon Air Hotel, Inc. v. Time, Inc., supra,* and *Wasserman v. Time, Inc., supra* (WRIGHT, J., concurring). In *Bon Air* the court could not have been clearer, stating its test as follows:

> We thus proceed to our examination of the record, *viewing it and the inferences which might be drawn therefrom in the light most favorable to [the plaintiff],* to ascertain whether "the record established by [the plaintiff] demonstrate[s] that there is *no issue of fact from which a jury could find 'actual malice.'* "

426 F.2d at 865 (footnotes omitted) (emphasis added). In *Wasserman,* in voting for summary judgment, Judge WRIGHT invited the reader to compare that case with *Goldwater v. Ginzburg,* 414 F.2d 324 (2nd Cir. 1969). The difference between the two cases is this: When the evidence was viewed in the light most favorable to the plaintiff in *Goldwater,* there was sufficient evidence to support a finding of actual malice with convincing clarity; in *Wasserman,* there was not. In this regard it should be noted that the court in *Goldwater* expressly distinguished *Washington Post Co. v. Keogh,* 365 F.2d 965 (D.C. Cir. 1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), in which the opinion was written by Judge WRIGHT, who viewed the plaintiff's pre–trial material in its "broadest possible signifi-

cance," *i. e.*, in the light most favorable to the plaintiff, before ruling that it was insufficient to warrant the denial of the defendant's motion for summary judgment. *Id.* at 971.

In short: *Bon Air, Wasserman,* and *Washington Post,* cited with approval in *Curran,* are all cases in which the evidence was viewed in the light most favorable to the plaintiff as the non–moving party. In all of them, the evidence, *so viewed,* was insufficient to support a finding of actual malice with convincing clarity. In *Goldwater,* in contrast, the evidence, so viewed, was sufficient to support a finding of actual malice with convincing clarity. *Curran* belongs with *Bon Air, Wasserman,* and *Washington Post,* and not with *Goldwater,* for the evidence in *Curran* when viewed in the light most favorable to the plaintiff as the non–moving party was insufficient to support a finding of actual malice with convincing clarity–at least, it was thus insufficient in the opinion of three of six judges of this court.

–b–

The second respect in which Judge CAVANAUGH takes issue with the conclusion expressed in *Curran* is that it "appears ... [to hold that] the trial court must make an initial determination as to whether the plaintiff can establish actual malice with convincing clarity." At 631. Of course, on every motion for summary judgment the trial court must make an initial determination as to whether the plaintiff can prove his case. If Judge CAVANAUGH means that under *Curran* this initial determination must be made on any basis other than the evidence as viewed in the light most favorable to the plaintiff, I hope that it is clear from what has been said above that that is not so. I think, however, that the judge means more than that. As I read his opinion, he is critical of the statement in *Curran* that in a case involving the first amendment, "summary judgment is a preferred procedure." 261 Pa.Super. at 127, 395 A.2d at 1346. However, I remain persuaded that the statement is sound.

The question is, *"In what sense* is summary judgment a 'preferred procedure?'" As explained above, it is *not* a preferred procedure in the sense that the trial court should view the evidence in a light any less favorable to the non–moving party than the light in which the court views the evidence in a summary judgment case not involving the first amendment; in·all summary judgment cases, whether or not the first amendment is involved, the court must view the evidence in the light most favorable to the non–moving party. However, in my opinion, after the court *has* so viewed the evidence, it should act differently in a summary judgment case involving the first amendment than in an ordinary summary judgment case. It is this difference that leads to the statement that in a case involving the first amendment, summary judgment is a preferred procedure.

In the ordinary case the court will refrain from entering summary judgment if there is the least doubt. *Schaffer v. Larzelere,* 410 Pa. 402, 403–08, 189 A.2d 267 (1963); *Bollinger v. Palmerton Area Communities Endeavor, Inc.,* 241 Pa. Super. 341, 361 A.2d 676 (1976). In other words, in an ordinary summary judgment case the burden of the plaintiff (if the plaintiff is the non–moving party) is very slight; it is easy to avoid entry of summary judgment. *See, e. g., Couts v. Ghion,* 281 Pa.Super. 135, 421 A.2d 1184 (1980). However, in a case involving the first amendment the burden of the plaintiff is heavier–not enormously heavier but nevertheless definitely heavier. In such a case, as was said in *Curran,* to avoid entry of summary judgment "[i]t is not enough for the plaintiff ... to *argue* that there is a jury question as to malice; he must *make a showing of facts* from which malice may be inferred [citations omitted]. Such an inference must be *clear* [citation omitted]." 261 Pa.Super. at 129–30, 395 A.2d at 1348 (emphasis added). The way this difference works may be seen by reference to some of the cases cited in *Curran.*

In *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), a magazine article said that a new play ·was a "re–enactment" of an experience suffered by the plaintiff

and his family. As described in the article, the experience was marked with violence and the family had been harassed. However, the author of the article had in his file news clippings revealing that the experience had in fact been non–violent and that the book–the source of the play–was based on various other incidents as well as on the incident in which the plaintiff and his family had been involved. It is not difficult to see that when this evidence was viewed in the light most favorable to the plaintiff, it offered what the Court characterized as "reasonable support" for a finding of actual malice in the *New York Times* sense. Whether there was malice was therefore a question for the jury, not for the court. 385 U.S. at 394 n. 11, 87 S.Ct. at 545 n. 11. The same was so in *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974), where the article in question created at least one egregiously false impression by describing an interview that in fact never occurred. The same was also so, it may be noted, in *Goldwater v. Ginzburg, supra*, which, while not cited in *Curran*, might have been. There one article purported to be based on a poll that the authors of the article knew was unprofessional and the results of which the authors had distorted, while the other article characterized the plaintiff as "paranoid" without any factual basis and, moreover, purported to support this characterization by statements for which the authors could offer no support.

Thus in all of these cases–*Time, Cantrell,* and *Goldwater* –the plaintiff was able to point to "facts" which made it "clear" that a jury could reasonably find malice in the *New York Times* sense. However, in *Curran* –again, in the opinion of three judges–this was not so. There the plaintiff could point to *some* facts, to be sure, but not to *enough* facts to constitute reasonable support for a clear finding of malice in the *New York Times* sense. *See* in particular the discussion in *Curran* in 261 Pa.Super. at 133–36, 395 A.2d at 1350–1351, and at 137–38, 395 A.2d at 1352, explaining why the facts cited by the plaintiff were tangential only, and why when examined in light of all the facts it was apparent,

on the best view of his case, that the plaintiff had done no more than merely allege malice instead of offering reasonable support for a clear finding of malice.

I recognize that a plaintiff may very well resent a rule that makes it more difficult to avoid entry of summary judgment in a case involving the first amendment than in an ordinary case; such a "preferred procedure," he may feel, prefers the defendant–defamer to him. And indeed it does. The preference, however, is a deliberate one, and is based on considerations that I find compelling and that I should be most reluctant to see abandoned. These considerations have been fully stated in many cases, which are cited in *Curran*. It is enough to say here that someone afraid of being harassed by a lawsuit will tend to hold his tongue; only if we require the plaintiff, when resisting a motion for summary judgment, to make a showing of facts that offer reasonable support for a clear finding of malice will we "lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers. . . ." *Rosenblatt v. Baer*, 383 U.S. 75, 88 n.15, 86 S.Ct. 669, 677 n.15, 15 L.Ed.2d 597 (1966).

In saying this I am aware of the footnote in *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9, 99 S.Ct. 2675, 2680 n.9, 61 L.Ed.2d 411 (1979), quoted by Judge CAVANAUGH. At 631. However, I regard the effect of this footnote as speculative at best. The footnote did not articulate what "doubt" was felt, nor why, nor what different rule should be applied; it expressly stated that the issues involved in deciding upon a different rule were not before the court. For me, it would take much more than such a footnote to "cast in doubt" either the "vitality" of the cases or the power of the considerations that I have discussed. Furthermore, if the footnote is indeed the first signal for a soon–to–be–executed retreat by the United States Supreme Court, I shall not join the procession. We are always able to permit greater freedom in this Commonwealth than do the federal courts. *See e. g., Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975) (refusal to follow limitations on exclusion-

ary rule expressed by the United States Supreme Court in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)). Other states have also found their state constitutions to provide their citizens with greater protection than the federal courts have found in similarly worded federal constitutional provisions. *See e. g., Baker v. City of Fairbanks*, 471 P.2d 386 (Alaska 1970) (right to jury trial even in petty offenses); *People v. Disbrow*, 16 Cal.3d 101, 127 Cal. Rptr. 360, 545 P.2d 272 (Cal. 1976) (refusal to follow exclusionary rule limitation of *Harris v. New York, supra*); *People v. Brisendine*, 13 Cal.3d 528, 531 P.2d 1099, 119 Cal.Rptr. 315 (1975) (refusal to follow limiting rule established in *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Burrows v. Superior Ct.*, 13 Cal.3d 238, 529 P.2d 590, 118 Cal.Rptr. 166 (1974) (finding contrary to federal law that individuals have reasonable expectation in privacy of their bank records); *State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971) (Hawaii Constitution excludes evidence of past convictions for purposes of impeachment to insure defendant's right to testify will not be chilled); *State v. Sklar*, 317 A.2d 160 (Me., 1974) (Maine Constitution requires trial by jury even in petty offenses); *People v. Jackson*, 391 Mich. 323, 217 N.W.2d 22 (1974) (state constitution provides greater right to assistance of counsel than federal constitution); *State v. Johnson*, 68 N.J. 349, 346 A.2d 66 (1975) (New Jersey Supreme Court found, *sua sponte*, identically phrased provision of New Jersey Constitution provided greater showing of consent for warrantless search than is required by the United States Supreme Court interpreting the fourth amendment of federal constitution). *See also* Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L.Rev. 489 (1977); Falk, The Supreme Court of California 1971–1972, Foreword: The State Constitution: A More Than "Adequate" Nonfederal Ground, 61 Calif.L.Rev. 273 (1973); Howard, State Courts and Constitutional Rights in the Day of the Burger Court, 62 Va.L.Rev. 873 (1976); Wilkes, The New Federalism in Criminal Procedure: State Court Evasion of the Burger Court, 62

Ky.L.J. 421 (1974); Wilkes, More on the New Federalism in Criminal Procedure, 63 Ky.L.J. 873 (1975).

–2–

The essence of appellants' argument is the following contention, which appears in their Summary of the Argument:

> [Appellants] contend that the newspaper article and headline in suit would give the average reader the impression that some of the citizens of the City of Pottsville believed that [appellants] intentionally conspired to kill the son of the Police Chief because of a vendetta between Police Commissioner Brophy and the deceased boy's father.

Appellants' Brief at 4.

Initially, several comments may be offered by way of defining the exact issue we must decide. The article and headline do not say that appellants either intentionally conspired to kill or did kill the son of the Police Chief. In their complaint, however, appellants alleged that "[t]he many buyers and readers" of the Philadelphia Inquirer "understood and derived the meaning" from the article and headline that "[appellants] did, in fact, pursuant to a conspiracy, ambush and intentionally and unjustifiably kill" the son of the Police Chief. Complaint, para. 17, Record at 6a. Appellants have now abandoned this claim. As their Summary of the Agrument shows, they now claim only that the article and headline gave "the impression that *some of the citizens of the City of Pottsville believed* [not that the many readers and buyers of the Inquirer believed] that [appellants] *intentionally conspired to kill* [not also, and did in fact kill] the son of the Police Chief." [1]

It is by no means clear to me that appellants should be permitted thus to shift their ground. The lower court was obliged to decide whether to grant the motion for summary

---

1. It may be noted that apparently some of the citizens of Pottsville *did* in fact believe that appellants had intentionally conspired to kill the son of the Police Chief. *See* L. Eichel Dep. at 100; R. 154a (identifying two persons who apparently so believed). Thus it would seem that if the article and headline did give the impression that appellants claim they did, the defense of truth might be interposed.

judgment on the cause as pleaded. By shifting their ground on appeal, appellants appear to have conceded that the lower court was right in deciding that they could not prove their cause as pleaded. Why then should we, on appeal, in effect allow appellants to amend their complaint and argue that when the depositions and other pretrial material are read in the light of the complaint as amended, the conclusion follows that the motion for summary judgment should not have been granted? I do not think we should, for it cannot be said that the lower court erred in granting the motion when the only argument against the motion is that *if the complaint had been different*, the motion should not have been granted. When a plaintiff is met with a motion for summary judgment, he must decide whether his complaint can withstand the motion. If it will not, he must amend the complaint, so that either the motion is withdrawn or, if persisted in, is denied. A plaintiff should not be permitted to take the chance that the trial court will deny the motion, and then, if he loses that chance, on appeal make the argument that he would have made if he had amended his complaint.

I do not wish, however, to rest my decision on this point of practice, sufficient though I believe it to be. Since both Judge CAVANAUGH and Judge HESTER have considered the case on the merits, I shall too.

Why do appellants contend that the article and headline "would give the average reader the impression that some of the citizens of the City of Pottsville believed that [appellants] intentionally conspired to kill the son of the Police Chief?" Appellants emphasize the use of four words in particular. In their Summary of the Argument they identify three of these words, as follows:

> [Appellees'] use of the words "vendetta," "conspiracy" and that the shooting was "no accident" in the article and headline conveyed the distorted and false impression that some of the citizens believe that [appellants] intentionally conspired to kill the youth.
>
> Appellants' Brief at 5.

Elsewhere in their brief, appellants emphasize the use of the word "ambush." Appellants' Brief at 7.

Since the contention made concerns the impression given by the article and headline, the entire article and headline must be examined. The entire headline is: "A Killing in Pottsville: Reform or Vendetta?" The article that follows may be summarized as follows:

The article opens by stating that the 16 year old son of the Pottsville Chief of Police had been shot to death by a Pottsville police officer, who is later identified in the article as Patrolman Charles Charlesworth. The article says that the "police say [the youth] was about to commit a robbery." The fourth paragraph of the article says:

> What is even more remarkable about the shooting is that there are people in this town who suggest that it was no accident. They say it was the logical, albeit extreme, extension of a dispute that has been tearing the 30–man police department apart for 18 months.

The article goes on to quote the attorney for the Chief of Police as saying, "It was an ambush." The article then proceeds to give several accounts, tending to weave them together, and shifting back and forth among them.

One account pertains to the robbery. It is said that the State Police got a telephone tip about just where, when and how the robbery would occur, and that the son of the Chief of Police would be one of the robbers; that the Police Commissioner thereupon assembled three police officers and he and the officers planned a stakeout; that the robbery started much as the tipster had said it would; and that according to the Police Commissioner, "who was there but says he did not see the shooting itself,"

> young Quirk [the son of the Chief of Police] spotted Patrolman Charlesworth in the trees and told the others .... Quirk had a shotgun. He reportedly turned toward Charlesworth and pulled back the action of the gun as if to sock it. Charlesworth fired his own shotgun, hitting Quirk in the head.

Authorities said that Quirk's shotgun was not loaded and that no ammunition was found on the scene.... It is also said that the State Police and local district attorney are investigating the shooting and expect to report to a coroner's inquest.

Another account pertains to the Police Commissioner and the relationship between him and the Chief of Police. Generally, it is said that the Commissioner is an outsider who has been trying to reform the police force, and that the Chief is an old–timer. The Commissioner is quoted as saying that some of the old–timers are "so treacherous", that "[w]hen we need a gambling bust, I call in the State Police. I can't use my own men." He is said to "see[ ] himself as a man who has tried to bring professionalism to our out–moded and resistant police department." "Critics" are said to see the Commissioner "as an impersonal dictator who has destroyed police morale and channeled all decision–making power to himself." It is said that "[t]he old–timers on the police force resent the changes [made by the Commissioner]", that "a lot of them want to get rid of him," that "[b]efore the record is closed in the strange case of Stephen Quirk, the old–timers may get their way," and that the Commissioner "is not optimistic about his future in Pottsville," although he "says he would like to stay and continue the work he has started."

Another account pertains to various reactions to the shooting. One person is quoted as saying that the shooting "was long overdue. It'll cut down on all the gaddamn [*sic*] nonsense going on around here. The kid deserved it." Most of the other reactions reported are reported as critical. One person is quoted as saying, "Christ, give the kid a chance." Another is quoted as saying: "It was Brophy [the Commissioner] and three of his handpicked men who went out there. It's just my opinion, but there has to be more to this." Just before this last quotation it is said:

The other talk–the talk of a conspiracy–focuses not on Patrolman Charlesworth, the man who apparently pulled the trigger, but on Police Commissioner William Brophy,

who planned the police action that ended in the fatal shooting.

Also, it is said:

In retrospect, many Pottsville residents wonder why the police didn't stop the youngsters as soon as they climbed up the hill, or why they didn't place a patrol car in the restaurant parking lot to scare them off and prevent the crime. "Why did they decide to play Kojak?" McManaman [the manager of the restaurant when the attempted robbery occurred] asked.

Immediately after this paragraph another person is quoted as saying "That's the new commissioner. They (the cops) were looking for trouble. A lot of people don't like that man."

Finally, in the course of describing the incident, the article gives some conflicting accounts. It is said that according to the Police Commissioner, "his first move" after he was tipped off about the robbery was to call the Chief of Police but that the Chief was not home. It is then said that the Chief's lawyer says that except for half an hour at most the Chief was home and that "no real effort was made to alert him of what was about to happen to his son." The Commissioner's decision to go with the officers on the stakeout is characterized as "a highly unusual move." The Commissioner is quoted as responding to this criticism by saying, "Yes, it's unusual for me to go out on a case. But robbery is an unusual crime for Pottsville," and that "[h]e said he took the men he felt he could trust." Immediately after this it is said that "[b]esides failing to contack Chief Quirk, Brophy also did not let the employees of the restaurant know they were about to be robbed, Michael McManaman, the restaurant manager said."

In my opinion, this case is squarely within the rule stated in *Curran*, in the opinion in support of affirmance, and in the cases there cited. In other words: When the article and headline are read in the light most favorable to appellants, still, they do not constitute reasonable support for a clear finding by a jury of malice in the *New York Times* sense.

Accordingly, the lower court properly granted appellees' motion for summary judgment.

As noted, appellants emphasize the words "vendetta," "ambush," "conspiracy," and "that it [the shooting] was no accident."

Appellants quote Webster as defining "vendetta" to mean

1. A feud in which the relatives of a murdered or wronged person seeks vengeance on the wrongdoer or members of his family

2. Any bitter quarrel or feud.

The article did indeed, plainly and at some rather considerable length, describe a bitter quarrel or feud between the Police Commissioner and the "old-timers," including the Chief of Police. However, nothing suggests that the description was inaccurate.

Appellants quote Webster as defining "ambush" to mean

1. An agreement of persons in hiding to make a surprise attack. 2. a) the persons in hiding b) their place of hiding. 3. The act of so lying in wait to attack.

Again, the article did describe an ambush—a police stakeout of an attempted robbery—but nothing suggests that the description was inaccurate.

Appellants quote Webster as defining "conspiracy" to mean

1. A planning and acting together secretly, especially for an unlawful or harmful purpose, such as murder or treason. 2. The plan agreed on; plot. 3. The group taking part in such a plan. 4. A combining or working together.

I agree that when read in the light most favorable to appellants, the article may be read as describing a conspiracy. The question is, "What *sort* of conspiracy?" I think it plain that the answer is, "A conspiracy by the Police Commissioner and some of his men to catch the son of the Chief of Police red-handed in the attempt to commit a robbery." I also think it plain that the article and headline may be read as saying that this conspiracy arose from, or was part of, or incident to, a vendetta between the Commissioner, on

the one hand, and the Chief of Police and other old–timers, on the other hand, and that at least one purpose, perhaps even the principal purpose, of the conspiracy was not so much to catch the youth as to embarrass the Chief of Police and the other old–timers and thereby take vengeance on them for their resistance to the Police Commissioner's attempt to reform–as the Commissioner saw it–the police department. I see no basis, however, for reading the article as saying that the Police Commissioner conspired with his men to murder the youth. The article quite specifically precludes any such interpretation. Thus it is said that Patrolman Charlesworth only shot the youth after the youth "reportedly turned toward Charlesworth and pulled back the action of the gun as if to sock it."

Finally, there are the words that "it [the shooting] was no accident." If nothing else had been said, perhaps when read in the light most favorable to appellants, these words might be read as meaning, "It was no accident; it was a deliberate killing." However, when read in context, it is plain, in the light most favorable to appellants, that the words mean, "It was no accident but the result to be expected when a dictatorial Police Commissioner, bent on taking vengeance on his rival, engages in a clumsy, dangerous, and unnecessary stakeout."

At this point it is necessary to recall that appellants have shifted their ground. As noted above, in their complaint appellants alleged that "[t]he many buyers and readers" of the Inquirer would read the article and headline as meaning "That [appellants] did, in fact, pursuant to a conspiracy, ambush and intentionally and unjustifiably kill" the son of the Chief of Police. Now that the article and headline have been examined, with attention to the words that appellants especially complain of, it may be seen why the lower court was correct in granting appellees' motion for summary judgment, and why appellants have shifted their ground to argue to us, not that the article means they conspired to kill, and did kill, but that it "give[s] the average reader the impression that some of the citizens of the City of Pottsville

believed that [appellants] intentionally conspired to kill the son of the Police Chief because of a vendetta between Police Commissioner Brophy and the deceased boy's father." Appellants' Brief at 4. However, appellants' new argument is no better than their old. If the article and headline cannot be read as meaning that the Police Commissioner conspired to kill, they cannot give the average reader the impression that some of the citizens of the City of Pottsville believed the Commissioner conspired to kill. It is true that the article says that "there are people in this town who suggest that it [the shooting] was no accident," but as we have seen, this cannot be read—at least it cannot be read in context—as saying that "there are people in this town who suggest that the shooting was a deliberate killing."

Appellants, however, urge upon us the fact that the author of the article said in his deposition that in fact there was one person in town, a construction worker, who did say the shooting was a deliberate killing. Appellants' Brief at 22.[2] I do not see how this helps appellants. The author also said that he did not believe the construction worker, and that because he did not, he did not quote him in the article. (Eichel Deposition, Record at 154a.) It may be granted that *if* the author *had* quoted the construction worker, *despite* the fact that he did not believe him, perhaps a jury might find malice; but no basis for a finding of malice exists where the author did *not* quote the construction worker, *nor otherwise* give the impression that someone had said that the shooting was a deliberate killing rather than the result of a bitter feud and poor police work.[3]

**2.** There appear to have been two such persons. *See* footnote 1, *supra.*

**3.** I recognize that the present case is not typical. In the typical case, the defendant has published an article that makes a false statement, and the plaintiff contends that the defendant either knew his "facts" to be false or published them without caring about their possible falsity; there is usually no dispute about what the publication actually said. Here, appellants and appellees have different interpretations of the same article. Appellants argue that the article is defamatory in that it gives the impression that some of the citizens of Pottsville believed that they conspired to kill the son of the Chief of Police.

In summary then: The very most that can be said for appellants' case is that if someone were to read the words that the shooting "was no accident," without reference to all else that was said, he might jump to the conclusion that some "people in this town [Pottsville]" believed the shooting was deliberate. Such a case, I submit, is not strong enough to withstand a motion for summary judgment. It is not enough for the plaintiff to show *some* facts. He must show *enough* facts to constitute reasonable support for a clear finding of malice in the *New York Times* sense. *See Curran* (opinion in support of affirmance) and the cases there cited. Here, when all of the evidence is examined, in the light most favorable to appellants, it cannot be maintained that a jury could discover any reasonable support for a finding of malice.

For the foregoing reasons, I agree that the order of the lower court should be affirmed.

HESTER, Judge, dissenting:

I respectfully dissent. From the manner in which the material was presented plus the structure of the headline, the average reader could conclude that the intentional shooting mentioned earlier in the article was the end product of a conspiracy among appellants motivated by a dispute between Brophy and some members of the police department. Viewing the evidence as well as all inferences arising therefrom in the light most favorable to the appellants, there is a genuine issue of fact from which a jury could reasonably find malice. Summary judgment was not appropriate.

I would reverse and remand for trial.

Appellees argue that they never intended to give such an impression; appellees seem to concede that an article that did give such an impression would be false. *But see* footnote 1, *supra.* Thus we are presented with a preliminary question of whose interpretation of the article should control. The existence of this preliminary question, however, does not mean that this case should be decided differently from the typical case. We still must decide whether appellants have shown enough facts to constitute reasonable support for a clear finding of malice.