Angelo MEDURE, an individual,
and Charlotte Medure, an
individual, Plaintiffs,

v.

The NEW YORK TIMES COMPANY, a
corporation, and The Press Democrat,
a corporation, Defendants.

No. Civ.A. 94–953.

United States District Court,
W.D. Pennsylvania.

Aug. 20, 1999.

480

Jeffrey P. Brahan, Richard DiSalle, Susan Hileman Malone, Rose, Schmidt, Hasley & DiSalle, Pittsburgh, PA, for Angelo Medure, Charlotte Medure, plaintiff.

Mark R. Hornak, Michael Flinn, Buchanan Ingersoll, Pittsburgh, PA, George Freeman, The New York Times Company, New York City, for New York Times Company, Press Democrat, defendants.

## OPINION

COHILL, Senior District Judge.

Before the Court are objections to the magistrate judge's Report and Recommendation (Doc. 77) in this matter, which recommends that we grant in part and deny in part the defendants' motion for summary judgment (Doc. 49). Plaintiffs Angelo Medure and Charlotte Medure[1] filed this action against the *Santa Rosa Press Democrat* (*"Press Democrat"*), a Santa Rosa, California, newspaper, and its owner and publisher, the New York Times Company (collectively, "the defendants"), alleging defamation in two articles published in the *Press Democrat* in 1993.

The parties were given until September 9, 1998 to file their objections to the magis-

---

1. Plaintiff Charlotte Medure died on March 9, 1998. We will refer to the plaintiff as "Me-    dure."

trate judge's report, and until September 23, 1998 to file any responses. Both parties filed objections. However, on September 16, 1998 we inadvertently adopted the Report and Recommendation as the Opinion of the Court (Doc. 86), before the time for filing responses had run. We then granted defendants' motion for reconsideration of our Order adopting the Report and Recommendation, and heard oral argument on the relevant issues on November 23, 1998.

Our task here is to make a *de novo* review of those portions of the Report and Recommendation to which objections have been made by either party, and, on these points, we have reviewed the defendants' motion for summary judgment and the plaintiffs response thereto, together with all accompanying briefs, exhibits, and affidavits. As previously mentioned, our task was greatly aided by oral argument. For the reasons set forth below, we now find that Angelo Medure is a limited purpose public figure for purposes of all statements complained of in the newspaper articles at issue, and that he has failed to present clear and convincing evidence from which a jury could find that any of the statements complained of were made with actual malice. We will therefore withdraw our Order adopting the magistrate judge's Report and Recommendation, and issue this Opinion and Order, granting defendants' motion for summary judgment, as the Opinion of the Court in this matter.

## I. Factual Background

Angelo Medure is a western Pennsylvania businessman; he owns a number of businesses, including companies which establish and manage gaming casinos on Indian reservations. One such casino is the Shooting Star Casino on the White Earth Chippewa reservation in Menomen, Minnesota. Medure's management company, Gaming World International, negotiated the contract to develop the Shooting Star with White Earth Chief Darrell Wadena ("Wadena").

With his company Progressive Management, Inc. ("PMI"), Medure was involved in a partnership to develop another gaming resort at the Fountaingrove Country Club ("Fountaingrove" or "the Fountaingrove project"), which was located in Santa Rosa's wealthiest neighborhood. Medure's partners in this business venture were Fountaingrove's owners, the Futsu Golf Club Co. ("Futsu"), of Japan, and the Cloverdale Band of the Pomo Indian tribe, whose chief was Jeff Wilson ("Wilson"). Medure had previously negotiated with another Pomo tribe, the Hopland Band, to open a casino on its reservation, and he was pursuing additional casino management opportunities with northern California Indian tribes in Mendocino, Sonoma, and Lake counties.

During the summer of 1993, the *Press Democrat* published a number of articles about the proposed Fountaingrove casino. The two articles at issue here were published on June 13, 1993 and August 18, 1993. The June 13 article, entitled "Controversy surrounds key figure in SR casino proposal" ("the First Article"), was written by reporters Steve Hart ("Hart") and James Sweeney ("Sweeney"). Defs.' Ex. 18. The First Article discussed Indian reaction to the Shooting Star, Medure's management of the Minnesota casino, the efforts to open the Fountaingrove casino, and concerns about the influence of organized crime on Indian casinos.

On August 18, 1993, the *Press Democrat* published the other article at issue here, a story by Steve Hart entitled "Reports tie gaming promoter to mob." ("the Second Article"). Defs.' Ex. 29. This story reported on an article published by *U.S. News & World Report* ("the US News Article") in its August 23, 1993 issue, under the heading "Gambling with the Mob? Wise Guys Have their Sights Set on the Booming Indian Casino Business." Defs.' Ex. 32. A significant portion of the *US News* Article concerned Angelo Medure. The article reported that Medure was being investigated by the FBI because he had leased a warehouse to Rocca's Italian Foods, "a pasta firm that was run in the

1980s by reputed mobsters." Defs.' Ex. 32. The article cited the Pennsylvania Crime Commission for the information that Henry "Zebo" Zottola ("Zottola") was president of Rocca's Italian Foods, and that Louis Raucci, Sr. was an investor and employee, and that both men were involved with organized crime. The article stated that Zottola was connected to the Genovese crime family. Raucci had been convicted of racketeering, narcotics, and tax violations in 1990, and was serving a 27–year sentence when the article was published.

*US News* further reported that it had obtained "confidential telephone records" confirming the relationship between Medure and Zottola. The latter made eight telephone calls to Medure's home, Florida condominium, and construction company during 1986. He also telephoned Medure early in 1993 to discuss selling him video-poker machines for the Shooting Star Casino, but Medure was not interested.

In the Second Article, the *Press Democrat* reported on reaction to the *US News* Article by Angelo Medure, as well as by others involved Fountaingrove. By the time the article was published, the Fountaingrove project had been rejected by local officials.

The *US News* Article was also the subject of an article in the *Pittsburgh Post-Gazette* newspaper.

While this action was assigned to the magistrate judge, the plaintiff sued *US News & World Report* for libel in the Court of Common Pleas of Lawrence County, Pennsylvania. *Medure v. U.S. News & World Report*, Civ. Action No. 973 (filed Oct. 28, 1997). The parties reached a settlement during trial, and the magazine published a retraction. The conclusions reached by the Honorable Ralph D. Pratt in that case have no preclusive effect on the action before us.

## II. Summary Judgment Standard

On summary judgment, the Court must examine the entire record in the light most favorable to the nonmoving party, drawing all justifiable inferences in his favor.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Childers v. Joseph*, 842 F.2d 689 (3d Cir.1988).

When determining summary judgment in the special context of a libel action brought by a public figure, we must remember the quantum and quality of proof required under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "[W]here the factual dispute concerns actual malice ... the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505.

## III. Objections to the Report and Recommendation

The magistrate judge's recommendations on defendants' motion for summary judgment are presented in his extensive and thoughtfully written report. Broadly stated, Medure objects to the magistrate judge's finding that there is no evidence from which a jury could find actual malice with respect to certain portions of each article which allegedly imply that Medure is linked to organized crime.

The defendants continue to object to the application of the substantive law of Pennsylvania to this case. By Order dated July 24, 1998 we adopted the magistrate judge's determination of the choice of law question, and we will not revisit it here. The defendants also object (i) to the conclusion that Medure is not a limited purpose public figure for all matters raised in this action; (ii) to the determination that any genuine issue of material fact remains for trial on the question of actual malice; and (iii) to the conclusion that any portions of either article are capable of a defamatory meaning. Finally, they object to the rec-

ommended denial of the "official reports" and "wire services" defenses, which the newspapers have asserted against Medure's claims.

## IV. Analysis

For the purposes of our analysis, we assume that the statements complained of are capable of a defamatory meaning. We turn first to the plaintiffs status as a public or private figure under defamation law, and will then address Medure's proffered evidence of actual malice.

### A.

■ If a statement is capable of a defamatory meaning, it is the role of the court to assess the proof offered by the plaintiff, and assure itself that the plaintiff has produced sufficient evidence from which a jury could find defamation. This inquiry turns on whether the plaintiff was a private or a public figure at the time the allegedly defamatory articles were published. The Report and Recommendation concludes that Medure is a limited purpose public figure "with regard to the limited subject matter of the establishment and management of Indian gaming facilities, as well as Medure's qualifications regarding the same." R & R at III(3). We note that no objections have been raised to this determination and will adopt it as the opinion of the Court.

However, the magistrate judge further concludes that Medure is not a limited purpose public figure with regard to the infiltration of organized crime into Indian gaming facilities, nor with regard to Medure's pre-gaming business activities, including any association with Henry Zottola before the latter was identified as a figure in organized crime. R & R at 37. The defendants object to this finding, and argue that Medure is a limited purpose public figure for **all** purposes in this litigation.

■ Determining whether a plaintiff is a public or private figure is a question of law for the court to decide. *Iafrate v. Hadesty*, 423 Pa.Super 619, 621 A.2d 1005, 1007 (1993). A media defendant has a constitutional privilege for the publication of defamatory falsehoods concerning public figures, and a plaintiff alleging such defamation is required to show clear and convincing evidence of actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (constitutional protection for defamation of public official); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (constitutional protection for defamation of public figure).

■ Extending the *Sullivan* line of cases, the United States Supreme Court has identified two types of public figures for purposes of defamation: all purpose public figures, such as politicians, who are widely recognized, and limited purpose public figures, who may not be well known on every issue but who are sufficiently involved in a particular area to be considered as public figures for that purpose. *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1077 (3d Cir.1988), citing *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). An individual becomes a public figure for a limited range of issues by thrusting himself "to the forefront of particular controversies in order to influence the resolution of the issues involved." *Rutt v. Bethlehems' Globe Publishing Co.*, 335 Pa.Super. 163, 484 A.2d 72, 80 (1984); *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296 (D.C.Cir.1980), quoting *Gertz*, 418 U.S. at 345, 94 S.Ct. 2997. "When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure." *McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3d Cir.1985).

■ To determine whether an individual is a limited purpose public figure, the court must first determine "the nature and extent of an individual's participation in the *particular controversy giving rise to the defamation.*" *Rutt*, 484 A.2d at 81, quoting *Gertz*, 418 U.S. at 352, 94 S.Ct. 2997. Thus our first step in deciding

whether Medure is a limited purpose public figure is to isolate the public controversy addressed in the articles and to assess Medure's own role in that controversy. *Waldbaum,* 627 F.2d at 1296. The plaintiff would have us narrowly circumscribe the public controversy here as "whether an Indian casino should be permitted at all in Fountaingrove." Pl's. Br. in Opp. at 6. The defendants urge us to adopt a broader definition of the controversy, and to find that Medure is a limited purpose public figure for the purposes of all statements made in the two articles.

We agree with the defendants' more expansive formulation. It is clear to us that Medure thrust himself to the forefront of a broad public controversy over gaming casinos on Indian property, and that this controversy encompassed more than just the isolated Fountaingrove project. Certainly, the proposed casino was a matter of great public controversy, both in Santa Rosa, where Fountaingrove was located, and in the surrounding geographic area, including Sonoma County and the *Press Democrat's* circulation area. Indeed, in trying to gain official and community approval for the Fountaingrove Casino plan through media and public relations events, Medure helped to create the controversy and became, as an individual and a businessman, a significant part of it.

We conclude that part of what was controversial about the Fountaingrove project was what effect the casino's development might have on the area, including whether such a facility might attract the involvement of organized crime. Thus, Medure's past business activities with individuals later determined to be involved with organized crime, including Henry Zottola and Louis Raucci, were germane to the controversy being reported in the *Press Democrat.* In addition, since this was not Medure's first involvement with a casino project, the controversy included ·his attempt to establish a casino with the Cloverdale Pomo tribe as well as his management of the Shooting Star Casino in Minnesota.

Accordingly, we find that Medure is a limited purpose public figure for the purposes of all statements made in the two articles before us, including the alleged involvement of organized crime in the Indian gaming industry, and including his past business activities in Minnesota and Pennsylvania. The allegedly defamatory statements were made regarding a matter of public controversy, with "foreseeable and substantial ramifications for non-participants." *Rutt,* 484 A.2d at 81, citing *Waldbaum,* 627 F.2d at 1296–97. Furthermore, by his involvement in the Fountaingrove casino project, Medure injected himself into the events which were the subject of the articles at issue, and attempted to influence the outcome of the controversy itself. *Rutt,* 484 A.2d at 81, citing *Wolston v. Reader's Digest Association,* 443 U.S. 157, 168, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).

With regard to the Second Article, Medure strenuously argues that he cannot be considered a limited purpose public figure for purposes of that article, since he was no longer involved in the Fountaingrove project by the time it was published. Pl.'s Br. in Opp. at 7. Indeed, the record shows that local officials had vetoed the project in July, and that PMI, Medure's management firm, had been "fired." Defs.'Ex. 25, 26. However, when the Second Article · appeared, Medure was still involved in various Indian gaming projects, including discussions with other area tribes regarding possible casino development. Moreover, the loss of some of these potential contracts forms the basis of his demand for damages in this action. In addition, the other partners in the Fountaingrove project had not completely abandoned the plan.

We find that our definition of the controversy for which Medure must be considered a limited purpose public figure encompasses the Second Article published by the *Press Democrat.*

## B.

■ As part of our determination of whether Medure is a limited purpose public figure, we must also consider whether the statements complained of relate to the public issue as we have defined it. This is a necessary step, since statements "wholly unrelated to the controversy ... do not receive *New York Times* protection." *Waldbaum*, 627 F.2d at 1298.

Certainly Medure's earlier business experience with the Shooting Star Casino, including the criticism of Medure's business arrangements with that casino as reported in the *Press Democrat*, are part of the public controversy as we have defined it. Furthermore, Medure's business activities with Zottola, although they occurred before the latter was recognized as a figure in organized crime, are directly relevant to the controversy over Indian gaming and the possible involvement of organized crime in that business. Accordingly, we find that the statements complained of in both the First Article and the Second Article are related to the public issue of the development of Indian casinos, to Medure's role and experience in that development and management, and to the genuine public controversy surrounding such development, including the possible involvement of organized crime in Indian casino gambling.

## C.

Having determined that Medure is a limited purpose public figure with respect to the statements complained of in these articles, and assuming for the purpose of this analysis that these statements are capable of a defamatory meaning, we turn to the dispositive issue in defendants' motion for summary judgment: whether Medure has met the burden imposed by *New York Times* and has produced clear and convincing proof from which a jury could find that the *Press Democrat* acted with "actual malice." *New York Times*, 376 U.S. at 279–280, 84 S.Ct. 710; *Fitzpatrick v. Philadelphia Newspapers, Inc.*, 389 Pa.Super. 438, 567 A.2d 684, 688 (1989).

■ The actual malice requirement is the court's attempt to achieve a balance between a free press and individual protection from libel and defamation. *Gertz*, 418 U.S. at 342, 94 S.Ct. 2997. The rule reflects the protection provided by the First Amendment to the free exchange of ideas. *Harte–Hanks, Inc. v. Connaughton*, 491 U.S. 657, 686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

■ Although this concept defies a single definition, actual malice requires that a false statement be made with "with knowledge that it was false or with reckless disregard for whether it was false or not." *New York Times*, 376 U.S. at 279–280, 84 S.Ct. 710; *Fitzpatrick*, 567 A.2d at 688. The public figure plaintiff bears the burden of showing that the statements at issue are false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Ertel v. Patriot–News Co.*, 544 Pa. 93, 674 A.2d 1038, 1041 (1996).

■ It is important to emphasize that this standard is not satisfied by "malice" in the usual sense, nor by evidence of personal spite or even ill will. *Harte–Hanks*, 491 U.S. at 666–67, 109 S.Ct. 2678. "Actual malice ... requires at a minimum that the statements were made with a reckless disregard for the truth." *Id.; Fitzpatrick*, 567 A.2d at 688.

■ In other words, the standard is a subjective one: the plaintiff must show that the defendant actually had a "high degree of awareness of ... probable falsity," but published the material anyway. *Masson v. New Yorker Magazine*, 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991), quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), *Fitzpatrick*, 567 A.2d at 688. Such evidence can overcome a defendant's insistence that it acted in good faith and with the honest belief that the statement was true. *Schiavone*, 847 F.2d at 1090. Whether the evidence in a defamation case is sufficient to support a finding of actual

malice is a question of law for the court to decide. *Harte–Hanks,* 491 U.S. at 685, 109 S.Ct. 2678, citing *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 510, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Actual malice may be established through circumstantial evidence. *Herbert v. Lando,* 441 U.S. 153, 170, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). However, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

▆▆▆ It is the plaintiffs burden to demonstrate actual malice by clear and convincing evidence. *Bose,* 466 U.S. at 511 n. 30, 104 S.Ct. 1949. This is a difficult burden to meet, and we caution that it is not met by a showing of mere carelessness or negligence. *Curran v. Philadelphia Newspapers, Inc.,* 376 Pa.Super. 508, 546 A.2d 639, 645 (1988). When offered against a media defendant, plaintiffs evidence of actual malice must indicate "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Brophy v. Philadelphia Newspapers, Inc.,* 281 Pa.Super. 588, 422 A.2d 625, 629 (1981), quoting *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). For example, "[f]ailure to investigate, without more, will not support a finding of actual malice, nor will ill will or a desire to increase profits." *Fitzpatrick,* 567 A.2d at 688, citing *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678. Similarly, "[a] defendant's failure to verify his facts may constitute negligence, but does not rise to the level of actual malice." *McDowell,* 769 F.2d at 951. Nor, without more, will a newspaper's motive in publishing a story. *Harte–Hanks,* 491 U.S. at 665, 109 S.Ct. 2678. An erroneous interpretation of the facts does not meet the standard. *Schiavone,* 847 F.2d at 1090, citing *Time, Inc. v. Pape,* 401 U.S. 279, 292, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). It is well settled that "[a]ctual malice cannot be inferred solely because the information gathered by the reporter is presented in an ambiguous and potentially defamatory manner." *Brophy,* 422 A.2d at 633, citing *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d, 495, 509 (3d Cir.1978). However, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant,* 390 U.S. at 732, 88 S.Ct. 1323. In addition, a media defendant's purposeful avoidance of the truth may be evidence of actual malice. *Harte–Hanks,* 491 U.S. at 692, 109 S.Ct. 2678.

▆▆▆ Finally, we emphasize that in determining whether there is sufficient evidence that a media defendant acted with actual malice, "we focus upon the investigatory efforts actually undertaken ... [and] not upon any additional efforts that might hypothetically have been undertaken." *Fitzpatrick,* 567 A.2d at 689. In making our determination, we must consider the article as a whole and read each word in the context of all the other words. *Rutt,* 484 A.2d at 76.

With this framework in mind, we now turn to Medure's proffered evidence that the defendants knew the information in the articles was false, or that they subjectively doubted its veracity yet published it anyway.

### i. The First Article

Medure's brief opposing summary judgment succinctly states his basic argument as follows: "The *Press Democrat* maliciously used the power of the press to derail the Fountaingrove project by portraying Angelo Medure as a mobster, when it knew that he was not." Pl's.' Br. in Opp. at 11.

▆▆▆ As evidence of actual malice, Medure first asserts that the article is the product of selective and biased reporting and that reporter Steve Hart manipulated interviews and documents, including the Department of Interior ("DOI") Report (Defs.' Ex.63), "to convey to readers that Mr. Medure was a sinister mafia figure

who was ripping off the White Earth Tribe for millions of dollars." Pl's. Br. in Opp. at 11. A reading of the entire article, however, shows that Hart included quotations from individuals who were supporters of Medure's management at the Shooting Star, such as White Earth Tribal Chairman Darrell Wadena, as well as comments from Lowell Bellanger who opposed the casino. In other words, Hart interviewed sources on both sides of the controversy surrounding casino gambling on Indian property, including the plaintiff himself. Medure's argument that Hart was given leads to many other people but did not interview them because they "would contradict his 'theme' " is without merit. Pl's. Br. in Opp. at 13.

■ With regard to the DOI Report, Medure contends that the First Article manipulates and mischaracterizes information about the Minnesota casino. He finds actual malice in the following paragraph:

Federal authorities also have been critical of business arrangements between Medure and the White Earth Chippewa tribe. The Minnesota casino was cited in a federal report that said tribes have lost millions of dollars because of theft, fraud and mismanagement by outside gaming management firms.

We disagree with Medure's contention that the use of the plural "authorities" for the director of the Minnesota Area Bureau of Indian Affairs shows actual malice on the part of reporter Hart. Furthermore, we point out that neither of the above statements appear to be false: the BIA was critical of revenue-sharing arrangements between the plaintiff and the tribe, and the casino was included in a DOI report as one of ten casinos defrauded by a third party check cashing service, a fact which is reported later in the article. Although the paragraph is hardly a model of journalistic clarity, and the juxtaposition of the above two sentences may have been confusing for some readers, we do not see this paragraph as evidence of actual malice. It is well settled that presenting in-

formation in an ambiguous or even in a potentially defamatory manner, which at best may describe this paragraph, does not raise an inference that the writer was acting with actual malice. *Brophy,* 422 A.2d at 633.

■ The plaintiff also argues that Hart "chose to quote and rely on sources whom he knew were biased and not credible," Pl's. Br. in Opp. at 13. In particular, Medure criticizes Hart's contacts with Minnesota reporter Susan Stanich, who had written a number of articles that were critical of the Shooting Star Casino. We find no record evidence that Hart relied on sources that he knew were unreliable, or that his reporting on this story in any way departed from ordinary journalistic standards. Since a newspaper's motive in publishing a story has no bearing on the question of actual malice, it is clear to us that relying on a source who opposes the issue at hand does not raise an inference that the reporter acted with actual malice. *Harte–Hanks,* 491 U.S. at 665, 109 S.Ct. 2678.

■ Medure further maintains that the portions of the First Article which concern the federal background checks required by the National Indian Gaming Commission ("NIGC"), imply that, had he undergone a full background check, the NIGC would have found negative information. Pl.'s Br. in Opp. at 14. The plaintiff argues that Hart's decision not to include information the reporter had from Tony Hope at the BIA, explaining that all NIGC background checks had been delayed, is evidence of actual malice.

The relevant portion of the First Article is as follows.

Futsu officials said Medure's company is a "federally approved gaming management firm" that will finance, develop and operate the resort. The firm also operates an Indian gaming site in Oklahoma and is expanding into Canada. "They've been checked out by the FBI," said Cloverdale Pomo Chief Jeff Wilson.

Medure has a federally approved contract to operate the casino at the White Earth reservation. But there has not been a full background check by the FBI, according to U.S. officials in Minneapolis and Washington, D.C.

"We have not done a background check on him yet," said Michael Cox, an attorney for the National Indian Gaming Commission in Washington. Officials at the Bureau of Indian Affairs in Minneapolis said the FBI did a cursory check of Medure's record and found no felony arrests or convictions.

We find no indicia of actual malice in the paragraphs quoted above. Indeed, Medure does not argue that the information in this portion of the First Article is false, or that Hart did or should have entertained doubts as to its veracity, both of which are necessary for a showing that there is evidence from which a jury could find actual malice. The plaintiff simply contends that Hart should have explained why a full check had not been made. In making a determination that a plaintiff has provided clear and convincing evidence of actual malice, it is not the court's role to second-guess either the reporting or the editorial decisions which determined the final form of the article. Rather, under *New York Times,* we must assess the evidence that the article was published knowing that it was false, or with reckless disregard for whether or not it was true. 376 U.S. at 279–80, 84 S.Ct. 710. Medure makes no such assertion here, and we find no evidence from which a jury could find that this portion of the First Article shows actual malice.

■ Medure also cites to several paragraphs under the subhead "Link to Crime Family" as further evidence of actual malice. That section of the First Article states:

A different gaming promoter who worked with the White Earth tribe in the late 1980s was linked by wiretap evidence to New Jersey's Bruno–Scarfo crime family and pleaded guilty in 1991 to illegal gambling.

Wadena met in 1988 with New Jersey businessman Carmen Ricci about setting up a casino on the reservation. Ricci, who made video gambling machines, was later indicted for conspiracy and racketeering.

Medure argues that the choice of heading implies that Medure himself has a mafia connection. We read these paragraphs, however, as referring to "a different gaming promoter," who was Carmen Ricci, an individual who was later indicted for conspiracy and racketeering. Medure's argument that including this discussion in the First Article "clearly implicates Medure and was intended to do so" (Pl.'s Br. in Opp. at 17), is contradicted by the clear statement "a different gaming promoter," and, in any event, is not evidence of actual malice. Medure does not dispute the accuracy of this account of these business dealings between the White Earth tribe and Ricci, and we read this part of the story as directly related to the broader on-going controversy about the effects of gaming on the Minnesota reservation.

■ Medure also finds evidence from which a jury could find actual malice in the fact that, although Hart had written most of the First Article, reporter Jim Sweeney conducted the telephone interview with the plaintiff, and then omitted parts of Medure's response to suggest that Medure's management practices with Indian casinos are connected to organized crime. Pl.'s Br. in Opp. at 17. However, the record shows that both Hart and Sweeney had researched the Fountaingrove project, and that Sweeney was familiar with the issues. Hart Dep. at 226; Sweeney Aff., Defs.' Ex. 16. Although Medure castigates Hart for not working on Saturday to personally interview Medure and finish the article himself, he does not contradict Hart's deposition testimony that the contract negotiated by his union did not permit him to work six days a week. Hart Dep. at 226. Hart also testified that he had repeatedly tried to contact Medure for an interview, before

leaving that assignment to Sweeney. Hart Dep. at 213–14; Sweeney Dep. at 156–58.

■ Medure argues that having another reporter finish the story shows that Hart had a reckless disregard for any evidence that would put the plaintiff in a different light, but this assertion is unsupported by any evidence of actual malice. In particular, the plaintiff argues that Sweeney used only part of Medure's response to a question about revenue projections for the Fountaingrove casino and his company's own revenue from the Minnesota casino, in order to suggest that Medure was hiding information. The article reports that, when asked about these figures, Medure replied "[t]hat's a private number." Sweeney's deposition testimony shows that, according to his notes, this was Medure's response. Sweeny Dep. at 227. We will not infer actual malice from that fact that the reporter did not include Medure's extended comments that it would be impossible to come up with a valid number at this point in the project. Nor is there evidence to suggest that having Sweeney contribute to the article was in any way a departure from the usual standards of reporting and investigation, much less the extreme departure from such standards which could show actual malice. *Brophy*, 422 A.2d at 629.

■ Finally, Medure asserts that by including the following quote from Miles Lord, which appears at the end of the First Article, the defendants acted with actual malice. Pl.'s Br. in Opp. at 17. Mr. Lord's opinions are reported as follows:

> Miles Lord, a former Minnesota attorney general and federal judge who represented dissident members of the White Earth tribe, said that while gaming may benefit Indian leaders and gambling promoters, "it spells disaster for the ordinary member of an Indian tribe."
>
> Tribal leaders frequently "give up management and effectively sell out their members to the Mafia or some other disreputable group," said Lord, who also served as U.S. Attorney for

Minnesota. He said state and federal authorities failed to protect tribe members from unscrupulous leaders. "I am sickened by the sight that I see," said Lord.

Medure's argument that these paragraphs show actual malice appears to be simply that "Miles Lord never stated or suggested that Angelo Medure was a member of the Mafia." Pl.'s Br. in Opp. at 17. The article makes no claim that he did; it merely quotes Lord's own opinion about the effects of casinos on Indian reservations. The Court does not share the plaintiffs narrow reading of the First Article. We are convinced that the article itself was about more than simply "introduc[ing] Medure to the Santa Rosa community" as the plaintiff insists. Pl.'s Br. in Op. at 17. Not every comment or opinion expressed therein points to Mr. Medure.

In conclusion, the plaintiff has failed to direct us to any record evidence from which a jury could find actual malice in any of the statements made in the First Article, and we will grant the defendants' motion for summary judgment on all statements therein.

### ii. The Second Article

■ Medure contends that the defendants acted with actual malice in publishing the Second Article, which reported on an article in *US News & World Reports*. Medure insists that Hart was assigned to independently investigate and verify the allegations made in the *US News* Article, and that he knew from his previous investigation that the allegations were false, but published them anyway. The plaintiff offers no record evidence to support this interpretation of Hart's assignment.

Hart testified at his deposition that his editor assigned him "to get responses to the issues that were raised in this [the *US News*] story." Hart. Dep. at 265–66. When Hart's editor, Charles Buxton, was questioned about the nature of Hart's assignment, he said that he had instructed the reporter to do three things: to talk to

Medure or one of his representatives, to speak with federal or state authorities, and to determine what local newspapers, especially the Pittsburgh papers, had done with the story. Buxton Dep. at 93. Buxton emphasized that Hart was not assigned to do an independent investigation. Buxton Dep. at 101. There is simply no evidence that the defendants published the Second Article with reckless disregard for whether it was true or not.

■ Medure also points to Buxton's deposition testimony for the proposition that the *Press Democrat* subjectively knew that the plaintiff was not linked to organized crime at the time the *US News* Article appeared, but published it anyway. Pl.'s Obj. at 7(a). We have carefully reviewed Charles Buxton's deposition testimony, and do not share the plaintiffs conclusions as to its significance. Buxton Dep. 134–40. Buxton testified that, **at the time of his deposition,** he did not believe that Angelo Medure was linked to organized crime. Buxton Dep. at 135–36. We find that Buxton did not testify that, when the Second Article was published, he knew that Medure was not linked to organized crime, and we find no evidence of actual malice from his testimony.

■ As further evidence that the Second Article was written and published with actual malice, Medure offers the fact that Hart did not interview certain individuals when writing the story. Hart did not call James Popkin, under whose by-line the *US News* Article appeared. Nor did he contact Zottola, Rocca's Italian Foods, or Jim Moody of the FBI, who were mentioned in the *US News* Article. Since our focus must be upon the investigatory efforts Hart actually made, we do not find evidence of actual malice in his failure to contact every individual or entity mentioned in the *US News* Article.

■ Medure also argues that in two respects Hart took liberties with the *US News* article from which a jury could infer that the defendants published the Second Article with actual malice. The plaintiff contends that the use of the plural "reports" in the headline "Reports Tie Gaming Promoter to Mob" implies that there were two independent news investigations into Medure's behavior which reached the same conclusion. The defendants assert that the plural refers to the *US News* article and to the account of it which appeared in the August 15, 1993 *Pittsburgh Post–Gazette.* According to the plaintiff, this is evidence of actual malice since Hart had previously spoken to reporters at the *Pittsburgh Post–Gazette* and learned that they had no information that Medure was linked to organized crime. Hart Dep. at 255–57. The Court concludes that the explanation given by the defendants is a plausible one, and, in any event, that there is no evidence that they deliberately published a falsehood or were indifferent to whether or not what they published was true.

■ Finally, the plaintiff takes issue with the description in the Second Article of Medure's relationship with Zottola as "a long-standing business relationship." However, it is undisputed that in 1986 the plaintiff leased a warehouse he owned to Rocca's Italian Foods, a company which had Zottola as its president and Louis Raucci as an investor and employee. Zottola made a series of eight telephone calls to Medure's home, condo, and business during the seven-year lease period. Zottola also telephoned Medure in 1993, and inquired about putting video poker machines in the Shooting Star Casino. The *US News* Article reported that Medure rebuffed Zottola's inquiry; the Second Article in the *Santa Rosa Press Democrat* did not include this information. We do not agree with Medure's contention that this discrepancy between the two articles, as well as in the characterization of the seven-year business relationship and eight or nine phone calls as "long-standing," is evidence from which a jury could find actual malice.

■ We find that the Second Article summarizes the *US News* Article, which, given the Fountaingrove project and the controversy it engendered, would have

been of considerable public concern and interest to the *Press Democrat's* readers. We will not infer actual malice from Hart's inclusion of the phrase "long-standing," since Medure had clearly known Zottola for a number of years. Furthermore, we note that even though Medure rebuffed the offer of video poker machines, Zottola did contact the plaintiff in that regard about the Shooting Star Casino during 1993, the year the Fountaingrove project was being developed.

Neither are we persuaded by Medure's argument that the implication that he had a long-term business relationship with a member of organized crime is evidence of actual malice. It is clear that, at the time of publication, both Zottola and Raucci had been identified by the Pennsylvania Crime Commission as members of the LaRocca–Genovese crime family in western Pennsylvania. Raucci was convicted in 1990 of racketeering, narcotics, and tax charges. Zottola later pled guilty to charges of bribery and money laundering in connection with an Indian casino project in California.

Viewing the evidence in the light most favorable to Medure, we find that the plaintiff has failed to demonstrate actual malice with respect to any statements contained in the Second Article, and will grant defendants' motion for summary judgment on this point.

### V.  Conclusion

We have determined that Medure is a limited purpose public figure for all statements complained of in the two articles in question. For the reasons set forth above, we find that the plaintiff has failed to meet his burden of providing clear and convincing proof from which a jury could find that the defendants acted with actual malice. Accordingly, we will withdraw our Order dated September 16, 1998 (Doc. 86) and grant summary judgment in favor of the defendants. We need not reach the defenses asserted by the newspapers.