Charles E. KUROWSKI, Appellant

v.

A. Parker BURROUGHS, Editor, Observer Publishing Co., Observer–Reporter, Appellee.

Superior Court of Pennsylvania.

Argued April 1, 2010.

Filed April 26, 2010.

Charles E. Kurowski, Canonsburg, for appellant.

Colin E. Fitch, Washington, for appellee.

BEFORE: MUSMANNO, OLSON, and FREEDBERG *, JJ.

OPINION BY FREEDBERG, J.:

¶ 1 This matter is before the Court on the appeal of Charles E. Kurowski from the order entered by the Court of Com-

---

* Retired Senior Judge assigned to the Superior Court.

1. Appellant sued A. Parker Burroughs, the editor of the Observer–Reporter, a Washing-

mon Pleas of Washington County entering summary judgment in favor of Appellee.[1] We affirm.

¶ 2 Appellant is an attorney who owns a building in Washington, Pennsylvania. In July 2005, the building was set afire by an arsonist. Following the fire, the building was scheduled to be demolished; however, Appellant successfully challenged the demolition order. In October 2005, Appellant was authorized to reenter the building.

¶ 3 Appellee published two articles and an editorial related to the above events. A January 24, 2006 article entitled "City: Torched Building Still in Disrepair," stated:

The owner of a building on North Main Street in Washington that was damaged by fire in July is in trouble for failing to make repairs to the building.

Attorney Charles Kurowski, who owns the building at 79–83 N. Main, has been cited by the city for failure to secure a vacant building.

An early morning fire that was blamed on arson damaged the building, which housed the Sunlight Club, a meeting place for recovering addicts, and several upstairs apartments. Chester Crothers, 47, of Washington, is to stand trial on charges that he set the July 23 fire.

The city had ordered the building demolished, but Kurowski hired an engineer who determined that the building was structurally sound and could be repaired.

ton newspaper, and the Observer Publishing Company, t/d/b/a the Observer–Reporter. We refer to these parties as "Appellee."

The appeals board unanimously ruled in October that he could make the repairs.

Michael Behrens, the city's code enforcement officer, said he has not heard from Kurowski since he won the appeal. The city wants a construction plan for the building. A Dumpster remains parked in front of the building. Behrens said the 30-day permit for that Dumpster has expired and the matter is being handled by police Chief John Haddad.

A hearing on the citation before District Judge J. Albert Spence has been set for 11 a.m. Feb. 16.

Kurowski did not immediately return a telephone call seeking comment....

¶ 4 An April 28, 2006 article, entitled "City Gives Building Owner Yet More Time: Main Street Building Struck by Arson Had Been Ordered Demolished," stated:

Attorney Charles Kurowski has been given more time to repair a building on Main Street in Washington that was badly damaged in a July arson.

Kurowski met behind closed doors Thursday with city solicitor Jeff Watson and code enforcement officer Michael Behrens prior to a hearing before District Justice J. Albert Spence.

After more than an hour of talks, the meeting ended with an agreement giving Kurowski 60 more days to complete work on the roof and install a facade on property at 79–83 N. Main St. He was given another 30 days to install windows on the building's upper floors.

"Mr. Kurowski provided documentation and information indicating that he's done substantial cleanup of the building," Watson said.

The city had determined that the building, which was severely damaged in the July 24 fire, must be demolished. However, Kurowski presented a renovation proposal to the building appeals board. In October, that board gave Kurowski the go-ahead to make the repairs.

"Since then, the city has not been satisfied with the progress," Watson explained.

Due to the agreement, the hearing before Spence was put on hold unless Kurowski doesn't follow through with his end of the bargain.

Meanwhile, Behrens said that Kurowski is not being singled out by the city and that other problem properties have been addressed....

¶ 5 An editorial, published August 9, 2006, was titled "City Should Target Rundown Properties." The editorial began by discussing an earlier newspaper article concerning use of the city's eminent domain powers against owners of run-down properties. The editorial continued:

Washington's solicitor Jeff Watson withdrew a building-code citation against Charles Kurowski, owner of 79–83 North Main St., which was heavily damaged in a fire more than a year ago. The property is being repaired at an agonizingly slow pace, but Watson said there was no point in pursuing litigation because the roof has been replaced and a facade installed. Kurowski says he's removed 70 tons of debris from the building and plans to work on the interior after the exterior is finished.

At the present pace of repair, we can probably expect completion sometime before the return of Halley's comet.

The editorial then discussed another rundown property on Main Street and concluded by saying that while eminent domain is one tool, the city can also pass and then "vigorously enforce" ordinances to

"force owners to take care of their property."

¶ 6 On October 20, 2006, based on these publications, Appellant brought suit for defamation against Appellee. On October 22, 2007, Appellant filed an amended complaint, asserting further defamation based on an article published July 11, 2007, entitled "City on Lookout for Rampant Weeds," which stated:

Some property owners in Washington grow flowers and vegetables. Others grow weeds. Big weeds.

Michael Behrens, city code enforcement officer, cites property owners for a variety of violations. But this time of year, overgrown grass and unwieldy weeds top the list.

According to the city code, every property owner must maintain grass height of four inches or under, and weeds must be trimmed. The ordinance also applies to absentee landlords and their rental properties.

Behrens said he does not have the time to drive around looking for violators.

"I totally depend on people calling me and giving me information concerning the height," Behrens said.

Reports of overgrown grass and weeds may be left on his office answering machine. Callers, Behrens said, do not have to leave their names.

"What I do need is a solid address. I need a numerical address, and once I get it, I go out and review. If it falls in violation, I generate a (form) letter," Behrens said.

So far this summer, he's received an average number of complaints. "It's all over the city. It's everywhere," he said.

A majority of the offending property owners are absentee landlords.

If a property is found to be in violation, Behrens sends a notice, giving the owner 10 days to correct the problem. After 10 days, he returns to the property. If the grass and weeds remain, a $300–per–day fine is levied.

If the property owner provides a valid excuse, Behrens said, he gives some consideration. Otherwise, the case goes to the office of District Judge J. Albert Spence.

Fines are not the object of the citations.

"I don't want the money. I just want them to cut the grass," he said.

Behrens does not address problems that may arise from the tall grass and weeds, such as rodents or health issues.

He goes out every day from 11 a.m. to 2 p.m. checking for ordinance violations.

Recently, calls from property owners on Lewis Avenue regarding grass and weed problems resulted in several property owners in the 200 block of North Main Street and nearby first block of West Walnut Street receiving notices.

Cited were: Jeffrey and Mary Florian, 231 N. Main St.; Anthony Seneca, for property at 269 N. Main St.; John Pettit, for properties from 15 to 17 W. Walnut St.; Charles Kurowski, for property at 19 W. Walnut St.; and David Lamansky, 239 N. Main St.

Also cited last week was the estate of Michael Puskarich for property at 333 Locust Ave.

To contact Behrens, call 724–223–4203.

As notices are sent, names and addresses of offenders will be published in the Observer–Reporter. Photos of some offending properties will appear.

¶ 7 On August 8, 2007, the Observer–Reporter published another article, which listed the names and addresses of individu-

als who were sent notices for weed and grass violations and those who were fined $300.00. The article included a paragraph stating that the property owned by Anthony Seneca, who was named in the July 11, 2007 article, was inspected, and the code enforcement officer "determined the growth accommodated residents' privacy and the case was closed without further action." Appellant was not mentioned in this article.

¶ 8 On August 17 and September 12, 2007, the Observer–Reporter again listed the names and addresses of property owners who were sent notices of code violations. On September 28 and October 19, 2007, the newspaper published lists of individuals who received notices of violations and lists of those who were cited and fined after receiving notices and failing to remedy the violations. Appellant was not mentioned in these articles.

¶ 9 On March 4, 2008, the trial court granted, in part, Appellee's preliminary objections and struck seven paragraphs from the amended complaint because they were scandalous and impertinent. On June 4, 2008, Appellee filed a motion for summary judgment. On July 20, 2009, the trial court granted the motion, finding that none of the publications were capable of defamatory meaning.

¶ 10 Appellant contends that the trial court erred in granting summary judgment.[2] Appellant argues that the publications were capable of a defamatory meaning because they portray him as an unscrupulous businessman and a cold-hearted slumlord. Appellant asserts that

the publications imply he is dishonest, selfish, and ignores his legal and civic obligations. He claims that others would be deterred from dealing with him based on the representations made in these publications. Relating to the articles concerning weed and grass violations, Appellant contends that in the first article that named him, Appellee incorrectly stated that he had been issued a "citation" rather than sent notice and failed to correct the mistake in subsequent articles. Appellant further asserts that some of the information contained in the publications is inaccurate and false, including that the building was in disrepair, that there was an expired permit on the dumpster, that the city wanted a construction plan, that a meeting was held prior to the scheduled hearing where Appellant and the city made a bargain, and that he was the owner of the property listed in the weeds violation article.[3]

¶ 11 When reviewing a grant of summary judgment, the scope and standard of review are as follows:

In reviewing an order granting summary judgment, our scope of review is plenary, and our standard of review is the same as that applied by the trial court. Our Supreme Court has stated the applicable standard of review as follows: [A]n appellate court may reverse the entry of a summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we

---

**2.** Appellant filed a statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925, on September 8, 2009. The trial court filed its 1925(a) opinion on October 26, 2009.

**3.** We note that Appellant originally brought another claim against Appellee relating to a

political advertisement concerning an election in which he was a candidate. However, on appeal, he "concedes that he cannot show that defendants published the political advertisement with actual malice, so he abandons the argument." Brief for the Appellant, at 12.

view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is de novo.

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Jones v. Levin,* 940 A.2d 451, 452–454 (Pa.Super.2007) (internal citations omitted).

¶ 12 The burden of proof in a defamation case is set forth at 42 Pa.C.S.A. § 8343 as follows:

    (a) BURDEN OF PLAINTIFF.—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

        (1) The defamatory character of the communication.

        (2) Its publication by the defendant.

        (3) Its application to the plaintiff.

        (4) The understanding by the recipient of its defamatory meaning.

        (5) The understanding by the recipient of it as intended to be applied to the plaintiff.

        (6) Special harm resulting to the plaintiff from its publication.

        (7) Abuse of a conditionally privileged occasion.

    (b) BURDEN OF DEFENDANT.— In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:

        (1) The truth of the defamatory communication.

        (2) The privileged character of the occasion on which it was published.

        (3) The character of the subject matter of defamatory comment as of public concern.

¶ 13 In *Rutt v. Bethlehems' Globe Publishing Co.,* 335 Pa.Super. 163, 484 A.2d 72 (1984), this Court stated:

It is the function of the trial court to determine, in the first instance, whether the communication complained of is capable of defamatory meaning. *Rybas v. Wapner,* 311 Pa.Super. 50, 54, 457 A.2d 108, 110 (1983); *Braig v. Field Communications,* 310 Pa.Super. 569, 574 n. 2, 456 A.2d 1366, 1369 n. 2 (1983). If the court determines that the communication is capable of a defamatory meaning, it then becomes the jury's function to decide whether it was so understood by those who read it. *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273 A.2d 899, 904 (1971); *Cosgrove Studio & Camera Shop, Inc. v. Pane,* 408 Pa. 314, 317–18, 182 A.2d 751, 753 (1962); *Dunlap v. Philadelphia Newspapers, Inc.,* 301 Pa.Super. 475, 482, 448 A.2d 6, 10 (1982); *Brophy v. Philadelphia Newspapers, Inc.,* 281 Pa.Super. 588, 592, 422 A.2d 625, 628 (1980); *Vitteck v. Washington Broadcasting Co., Inc.,* 256 Pa.Super. 427, 430, 389 A.2d 1197, 1199 (1978). See Restatement (Second) Torts, Section 614. A statement is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or deter third persons from associating or dealing with him. *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 270 (3rd Cir. 1980); *Marcone v. Penthouse International, Ltd.,* 533 F.Supp. 353, 357 (E.D.Pa.1982); *Corabi v. Curtis Publishing Co., supra* 441 Pa. at 442, 273

A.2d at 904; *Cosgrove Studio & Camera Shop, Inc. v. Pane, supra* 408 Pa. at 317–18, 182 A.2d at 753; *Rybas v. Wapner, supra,* 311 Pa.Super. at 54, 457 A.2d at 110. In determining whether the challenged communication is defamatory, the court must decide whether the communication complained of can fairly and reasonably be construed to have the libelous meaning ascribed to it by the party. *Corabi v. Curtis Publishing Co., supra; Bogash v. Elkins,* 405 Pa. 437, 176 A.2d 677 (1962); *Beckman v. Dunn,* 276 Pa.Super. 527, 533, 419 A.2d 583, 586 (1980); *Doman v. Rosner,* 246 Pa.Super. 616, 371 A.2d 1002 (1977). In making this determination upon the meaning of the article, it must be construed as a whole, *Corabi v. Curtis Publishing Co., supra* 441 Pa. at 444, 273 A.2d at 906; *Brophy v. Philadelphia Newspapers, Inc., supra* 281 Pa. [Pa.Super.] at 594, 422 A.2d at 629; *Beckman v. Dunn, supra* 276 Pa.Super. at 533, 419 A.2d at 586, and each word must be read in the context of all the other words. *MacRae v. Afro–American Co.,* 172 F.Supp. 184, 186 (E.D.Pa.1959), *aff'd.,* 274 F.2d 287 (3rd Cir.1960).

> The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them.

*Corabi v. Curtis Publishing Co., supra* 441 Pa. at 447, 273 A.2d at 907, quoting *Boyer v. Pitt Publishing Co.,* 324 Pa. 154, 157, 188 A. 203, 204 (1936); *Accord Rybas v. Wapner, supra* 311 Pa.Super. at 54, 457 A.2d at 110; *Brophy v. Philadelphia Newspapers, Inc., supra* 281 Pa. [Pa.Super.] at 594, 422 A.2d at 629;

*Beckman v. Dunn, supra* 276 Pa.Super. at 533, 419 A.2d at 586.

*Rutt,* 484 A.2d at 76–77.

¶ 14 In *Weber v. Lancaster Newspapers, Inc., et al.,* 878 A.2d 63 (Pa.Super.2005), *appeal denied,* 588 Pa. 759, 903 A.2d 539 (2006), this Court further explained the test applied in determining the threshold issue of whether a communication has "defamatory character:"

> In an action for defamation, the plaintiff has the burden of proving ... the defamatory character of the communication. It is the function of the court to determine whether the challenged publication is capable of a defamatory meaning. If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial.

> To determine whether a statement is capable of a defamatory meaning, we consider whether the statement tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him. Libel is the malicious publication of printed or written matter which tends to blacken a person's reputation and expose him to public hatred, contempt or ridicule. The court must view the statements in context.

> Words which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. Thus, we must consider the full context of the article to determine the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

> It is not enough that the victim of the [statements] ... be embarrassed or an-

noyed, he must have suffered the kind of harm which grievously fractured his standing in the community of respectable society.

*Weber,* 878 A.2d at 78, *quoting Tucker v. Phila. Daily News,* 577 Pa. 598, 848 A.2d 113, 123–124 (2004) (internal citations and quotations omitted); *Scott–Taylor Inc. v. Stokes,* 425 Pa. 426, 229 A.2d 733, 734 (1967); *Blackwell v. Eskin,* 916 A.2d 1123 1125 (Pa.Super.2007).

¶ 15 In determining whether the editorial was capable of defamatory meaning, a distinct standard is applied because the publication is of an opinion. *Veno v. Meredith,* 357 Pa.Super. 85, 515 A.2d 571, 575 (1986), *appeal denied,* 532 Pa. 665, 616 A.2d 986 (1992). "A statement in the form of an opinion is actionable only if it may reasonably be understood to imply the existence of *undisclosed* defamatory facts justifying the opinion. A simple expression of opinion based on disclosed ... facts is not itself sufficient for an action of defamation." *Id.* (internal citations omitted); *see also Neish v. Beaver Newspapers, Inc.,* 398 Pa.Super. 588, 581 A.2d 619, 622–624 (1990), *appeal denied* 527 Pa. 648, 593 A.2d 421 (1991) (editorial criticizing the way appellant handled his job and suggesting replacing him was an opinion not based on undisclosed defamatory facts and, therefore, was not actionable. The Court found that while the statements in the editorial "might be viewed as annoying and embarrassing, [they were] not tantamount to defamation.").

¶ 16 There was no implication in the editorial that the author was basing his opinion on undisclosed facts. The point of the editorial was to express the author's view that the city was not doing enough to force owners to repair run-down properties. The writer used Appellant's property as an example and expressed dismay over the slow pace of the restoration. There is no indication that he knew any details other than the ones discussed in the editorial, including the date of the fire that damaged the building, the withdrawn citation, and the progress made at the time the editorial was written. Regarding the editorial, the trial court stated: "Comments on the pace at which an owner undertakes repairs to his damaged building may be annoying or embarrassing but are simply not a subject that would tarnish one[']s reputation in the community." Trial Court Opinion, 10/26/2009, at 7, 11–12. We agree with the trial court that the expression of opinion in the editorial is not capable of defamatory meaning.

¶ 17 Regarding the January 24 and April 28, 2006 articles, the trial court found that "none of the articles tends to harm the reputation of another so as to lower him in the estimation of the community or deter third persons from associating or dealing with him.... This Court cannot conclude that the 'average person' would find these articles to 'be construed to have libelous meaning.'" Trial Court Opinion, 10/26/2009, at 8.

¶ 18 Appellant contends the articles imply he is a dishonest and heartless businessman who ignores his obligations. However, the January 24 and April 28, 2006 articles do not put any negative "spin" on the matters they discuss, nor do they portray Appellant in a particularly negative light. For the most part, they simply recount the events surrounding Appellant's property, including the fire that damaged the building, Appellant winning the right to restore the building, and the progress Appellant had made thus far in the renovations. The information contained in the articles is not such that a person in the community would be deterred "from associating or dealing with him;" nor is it such that it was capable of

"grievously fractur[ing] his standing in the community of respectable society."

¶ 19 Regarding the weeds violation articles, the trial court found that while the use of the term "cited" rather than "noticed," was "recognizably more serious," both indicated that the city discovered weeds and high grass on Appellant's property. The trial court noted that the article did not state that Appellant was guilty of a crime or that he would be punished in any way. Trial Court Opinion, 10/26/2009, at 11. The trial court continued, stating that "the fact that a person may be noticed or cited for tall weeds or grass is nothing that drives the public to express hatred or ridicule. To [Appellant], these articles may annoy or embarrass him, but as a matter of law there is no cause of action for defamation ..." Trial Court Opinion, 10/26/2009, at 9.

¶ 20 We agree that this article is not capable of defamatory meaning. While the article used the term "cited," in the preceding paragraph it stated that recent phone calls had resulted in several property owners "receiving notices." Use of the term "cited" is not sufficient to constitute defamation. As explained earlier, "[i]t is not enough that the victim of the [statements] ... be embarrassed or an-

noyed, he must have suffered the kind of harm which grievously fractured his standing in the community of respectable society." *Weber*, 878 A.2d at 78 (citations omitted). Being cited for a weeds violation, a summary offense[4], is not so weighty and severe as to constitute injury sufficient to support a cause of action for defamation.

¶ 21 Appellant also contends that some of the information in the articles is false—that the building was in disrepair, that there was an expired permit on the dumpster, that the city wanted a construction plan, that a meeting was held prior to the scheduled hearing during which Appellant and the city reached an agreement, and that he was the owner of the property listed in the weeds violation article. Even if the statements in the articles were false, that does not require a finding of defamatory character. *See, e.g., Maier v. Maretti*, 448 Pa.Super. 276, 671 A.2d 701, 704 (1995) (finding that even if the conduct at issue was falsely attributed to appellant, nevertheless the statement attributing it to her was not capable of defamatory meaning).[5]

¶ 22 We find that the trial court was correct in concluding that the publications

---

4. An action to enforce a municipal ordinance such as the local ordinance in the instant case may not even be a criminal case. In *City of Easton v. Marra*, 230 Pa.Super. 352, 326 A.2d 637 (1974), this Court, relying on *York v. Baynes*, 188 Pa.Super. 581, 149 A.2d 681 (1959), held that an action against a defendant "for violation of a municipal ordinance is a suit for the recovery of a penalty and is a civil proceeding." In *Town of McCandless v. Bellisario*, 551 Pa. 83, 709 A.2d 379 (1998), the Supreme Court explained: "While the enforcement of municipal ordinances *that provide for imprisonment upon conviction or failure to pay a fine or penalty* must follow the Rules of Criminal Procedure, the same is not true for municipal ordinances *that do not provide for imprisonment upon conviction or*

*failure to pay a fine or penalty*, which, by definition, are not Penal Laws ..." *Id.* at 381. Because the record does not disclose whether imprisonment is possible upon conviction of violation of the weed ordinance, we cannot determine whether the filing of a citation for violation of the ordinance is a criminal charge.

5. It is essential to a claim of defamation that the statements are false. *See Phila. Newspapers v. Hepps*, 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783 (U.S.1986) (holding that it is a constitutional requirement that a plaintiff alleging defamation bear the burden of demonstrating that the statements are false).

were not capable of defamatory meaning, and, thus, granting summary judgment in favor of Appellee.[6]

¶ 23 Order affirmed.

---

**6.** We do not address Appellant's second claim, relating to the propriety of striking seven paragraphs from the amended complaint, because of our conclusion that the trial court correctly determined that the statements complained of were not of a defamatory character.