2019 PA Super 316

| | | |
|---|---|---|
| MATTHEW MEYERS AND EMILY MEYERS, INVESTMENT GRADE BOOKS, LLC | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 391 EDA 2019 |
| CERTIFIED GUARANTY COMPANY, LLC, CLASSIC COLLECTIBLE SERVICES, LLC, MATTHEW A. NELSON, AND HERITAGE AUCTIONEERS & GALLERIES, INC. | : : : : : : | |

Appeal from the Order Dated January 22, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): Dec. Term, 2016 No. 01182

BEFORE: MURRAY, J., STRASSBURGER, J.*, and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.: **FILED OCTOBER 18, 2019**

The Appellants, Matthew Meyers and Emily Meyers (the Meyers) appeal the order of summary judgment entered in the Philadelphia County Court of Common Pleas as to their claims of defamation and false light against the Appellees, Certified Guaranty Company, LLC (CGC), Classic Collectible Services, LLC (CCS), Matthew A. Nelson (Nelson) and Heritage Auctioneer &

_____

* Retired Senior Judge assigned to the Superior Court.

Galleries, Inc. (Heritage).[1]  The Meyers contend that because there existed questions of material fact that should have gone to the jury, the trial court erred in ruling that those claims were not actionable.  Based on the facts outlined in the parties' respective motions and responses, the order of summary judgment must be reversed as to the defamation and false light claims but affirmed in all other respects.

## I.

The Meyers began restoring comic books professionally in 2013.  As they gained experience, they learned the tools of the trade, such as color touch, piece replacement, tear seals, cleaning or replacing staples, re-glossing and cover cleaning.  By skillfully applying those methods, a restorative artist can breathe new life into an aged and worn comic book, substantially increasing its market value.  Comic books sold at auction are typically graded on a "1 to 10" scale for overall condition, an "A to C" scale for the quality of restoration, and a "1 to 5" scale for the quantity of restoration work.

CGC is an entity which grades and certifies comic books for valuation purposes.  CCS is an entity that restores comic books and it is owned by CGC.

---

[1] The Appellant, Investment Grade Books, LLC, also asserted counts of intentional interference with existing business relations, intentional interference with prospective contractual relations, and civil conspiracy.  The trial court granted summary judgment in favor of CGC, CCS, Nelson and Heritage as to all those counts, but they are not at issue in this appeal; nor is the Meyers' claim of civil conspiracy.  *See* Pa.R.A.P. 1925(b)(4)(vii) (errors not included in a Statement of Issues are waived on appeal).

At the relevant times, Nelson had dual roles as both a grader for CGC and the president of CCS. In his capacity as a grader, he evaluated much of the Meyers' work. He also corresponded with the Meyers beginning in 2014, advising them on how to avoid the use of irreversible restoration techniques that would decrease a comic book's auction value, such as "trimming" the outer dimensions of pages and applying too much "color touch" to artwork.

It is undisputed that Nelson appreciated the Meyers' talent and sought to hone their ability. In fact, in 2014 alone, the Meyers had received the highest possible rating from CGC on seven comics they had submitted for evaluation. The next year, in January 2015, the Meyers met with Nelson at his office in Florida. Nelson reviewed a number of their restored comic books and gave them additional advice about which processes to use or avoid.

At the meeting, Nelson complimented a restored "Batman #1" as the best he had ever seen. Nelson also offered to "press" the Meyers' restored copy of "Amazing Fantasy #15" in order to remove a warp in the spine and thereby achieve an almost perfect grade from CGC. The Meyers followed Nelson's advice and were grateful to be mentored by a respected authority on comic book restoration.

The Meyers continued receiving generally high gradings from CGC well into 2015, having followed many of Nelson's suggestions. Nelson confirmed as much in April 2015, emailing them that a recent submission had earned a

very high grading. CGC awarded the Meyers the highest known grading in May 2015 for restored editions of two other comic books.

In 2015, the Meyers received two low gradings by CGC as to another "Batman #1" and an "Action Comics #7." The Meyers acknowledged that unusual circumstances during the restoration had caused a "stiffer" and "thicker" cover than usual on the Action Comics #7. Tape applied by a previous owner of the Batman #1 could not safely be removed, increasing its weight. Because of the disagreements between Meyers and Nelson on CGC's grading policies, the Meyers began having their work graded by a competitor of CGC called Comic Book Certification Service (CBCS).

The falling out between Nelson and the Meyers then took a public turn. On the Collector's Society forum, an online message board, a debate emerged among posters as to why CGC had decided to stop accepting the Meyers' work. CGC owns and operates the forum and Nelson moderated it as an administrator.

In a December 2015 message board thread, numerous posters questioned whether the Meyers were doing "re-creation" rather than "restoration" of original work. **See** Defendants' Motion for Summary Judgment, Exhibit "K.". Posters also remarked that CGC had decided to stop accepting work from the Meyers because they were destroying comic books rather than restoring them. **See id**. ("From what I'm hearing it seems CGC

won't grade these books because they are more 're-creations' than 'restorations'").

It bears emphasizing here that within the industry, a comic book's value becomes greatly diminished once any component is substituted or removed, such as "trimming" off the damaged edges of a page or "reprinting" covers with a Xeroxed copy. Such practices both mar the quality of the original comic book and mislead collectors about how much of the original work remains. "Re-creation" is often synonymous with "fake" or "counterfeit."

The Meyers addressed those concerns in posts to the thread dated December 30, 2015, explaining some of their restoration methods on certain projects and the reasons they stopped submitting their work to CGC. *Id*.[2] They denied that any of their work was "fake" or photocopied and claimed that they had stopped submitting work to CGC because they did not want their "proprietary techniques in the hands of CCS – the industry leader and [their] direct competition." *Id*.

---

[2] In a highly technical post on August 11, 2016, to the CGC message board, the Meyers explained that they would only "trim" extensively restored comic books when necessary to remove prior restoration. The post referred specifically to a highly valuable Detective Comics #27, which had been subject to lengthy discussion on the message board, including a post by Kenny Sanderson, an employee of CGC and CCS, who had remarked that it had been "trimmed." *See* Response in Opposition to Defendants' Motion for Summary Judgment, at Exhibit "A," pp. 83-84 (Deposition of Matthew Meyers). Therefore, while the Meyers may have trimmed certain comic books, the evidence makes it difficult to say whether original material or prior restorative materials were removed in the process.

That same day, Nelson responded on the message board with a post that is now at issue:

Up to the point we stopped receiving submissions there were issues with the work, reflected in our assigning either a B or C classification. A decision was going to be made whether to stop taking books that exhibited questionable work, but submissions ceased . . . *The point of professional restoration is to return a book back to as close to its original state as possible using reversible materials. When work becomes so extensive that it becomes hard to tell what is real and what is re-created, it is impossible to accurately and fairly represent a grade to the market*.

*Id*. (Emphasis added).

That post, in turn, generated dozens of lengthy responses on the thread by third parties, many of which cast the Meyers in a negative light:

At this point there is still a bit of a credibility gap between what [the Meyers have] said and what Matt Nelson just said.

[The Meyers] said that they didn't go to CGC because Matt is under their umbrella and they didn't want CCS appropriating their restorative techniques.

But [Nelson] just confirmed that CGC essentially determined the books were ungradable and showing restoration techniques that were questionable.

Evidently [CBCS] has no such qualms and will grade anything for the business and that's why these books are in [CBCS casings].

*Id*.

The doubts sown in such posts prompted Nelson to respond again, to clarify "misconceptions" on the thread that could "potentially [affect] the health of the restored market in the future[.]" *Id*. On January 3, 2016, he

then made the following statements, which like the earlier post, are also alleged to be defamatory:

> There are two particular aspects I hope to have been resolved. They were present on the books we graded (hence the B and C notations we gave) which were subsequently cross graded by CBCS, who gave them professional designations and usually a higher grade. *One was the large amount of color touch being applied to the covers, and the other was the material used as a glossing agent over that color touch*.
>
> . . . .
>
> I believe [the Meyers] used a product called Golden Gel, which is irreversible[.] To achieve all of these 9.6's and 9.8's (according to CBCS), either these flaws must be masked with a glossing agent, or only very high grade copies are chosen for restoration. *Based on the information I've seen, I don't believe that you are restoring books that were previously unrestored high grade copies. And I don't think there are enough 'perfect' candidates out there to produce the large number of ultra high grade books that have entered the market in only the past few months*.

*Id*. (Emphasis added). Nelson concluded by complimenting the Meyers' talent and remarking that after the "considerable strides" they had made, "a couple of the books turned out really great by [CGC's standards]." *Id*.

In addition to his public posts on CGC's message board, Nelson made a number of verbal statements about the Meyers to third parties, all of which are alleged to be defamatory:

- Commenting to a broker (Marcos Mercado) and one of the Meyers' buyers ("Cyrus") in June 2015 that a Detective Comics #29 was graded a "9," but deserved a non-professional level designation of "8." Response in Opposition to Defendants' Motion for Summary

- 7 -

Judgment, at Exhibit "A," pp. 82-83 (Deposition of Matthew Meyers).[3]

- Commenting to Mercado and Cyrus in July 2015 that the Meyers' work made comics "stiff," making them more like "re-creations" than restorations." *Id*. at Exhibit "W," p. 1 (Affidavit of Marcos Mercado).

- Commenting to the managing director of the Heritage (James Lonergran Allen) that the Meyers' work made comics thick and unnatural to the touch. *Id*. at Exhibit "I," p. 25 (Deposition of James Lonergran Allen).

Other CGC employees allegedly had made similarly negative remarks about the Meyers' work. Paul Litch (Litch), CGC's primary grader, sent an email in October 2014 to the managing director of the auction house, Heritage, saying that CGC had "caught a fake cover." *See* Response in Opposition to Motion for Summary Judgment, at Exhibit "S." The cover was never proven to be a fake and Litch could not explain in his deposition how he arrived at that conclusion.

Rumors about the Meyers' relationship with Nelson/CGC/CCS spread within their industry, beyond CGC's online message board.[4] Several

---

[3] Matthew Meyers claimed that these comments caused the buyer to become disgruntled and request a refund, ultimately receiving $3,000 back from the Meyers out of the total purchase price of $24,000. *See id*. CGC did grade the item a "C," but the record is not clear as to whether Nelson discussed the factual basis of that grading.

[4] *See* Matthew Meyers, Deposition, at 102 ("Well, I mean just about anybody who's ever talked to us says that they know that CGC won't grade our books and has reiterated everything that Matt has said.").

employees of Heritage took part in an email chain in which they wrote to each other that the Meyers were "reprinting" comic books and that CGC would no longer be grading them. Because of these suspicions, Heritage made a decision not to auction any of the Meyers' restorations. Yet during discovery in the ensuing litigation, none of those Heritage employees could verify the truth of those assertions or even say how they came to the knowledge exchanged in their emails. *See, e.g.,* Defendants' Motion for Summary Judgment, at Exhibit "N" (Deposition of Barry David Sandoval).

James Lonergran Allen (Allen), an employee of Heritage, admitted that at one point, he thought the Meyers' work was "fake" and said so to the owner of one of their restorations at a New York convention in 2015. *See* Response in Opposition to Motion for Summary Judgment, at Exhibit "I," at 41 (Deposition of James Lonergran Allen). The owner was able to convince Allen that his comic book was not a fake but Allen did not immediately report this episode back to his colleagues at Heritage who had still been dubious about the Meyers' work. *Id*. at 41-43.

The Meyers also alleged that a number of collectors and dealers conveyed to them at a convention in Chicago, in August 2016, that CGC had refused to grade their work and that Heritage had refused to auction it. When the Meyers spoke directly with Heritage's officers, they admitted to making a decision not to accept their submissions. That decision was ultimately reversed after the Meyers agreed to special conditions as to how their

restoration work would be described to buyers at auction. These conditions included caveats on a comic book's casing that warned of non-standard restoration techniques.

In their individual capacities and as their corporate entity, Investment Grade Books, LLC, the Meyers alleged that the above conduct by CGC, CCS, Nelson and Heritage constituted defamation, false light, tortious interference with a contract and civil conspiracy. **See** Complaint, at ⁋⁋ 61-97. Those defendants each filed motions for summary judgment as to all claims against them.

The trial court granted those motions for summary judgment and dismissed the action.[5] In its Rule 1925(a) opinion, the trial court reasoned that the Meyers' defamation claims concerned statements based on proven facts "not capable of defamatory meaning" or not published to a third party. Trial Court Opinion, 5/8/2019, at 15-18. The trial court also found that the

_____

[5] "[S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." **Atcovitz v. Gulph Mills Tennis Club, Inc.**, 812 A.2d 1218, 1221 (Pa. 2002); Pa. R.C.P. No. 1035.2(1). When considering a motion for summary judgment, the trial court must construe all facts of record and make all reasonable inferences in the light that most favors the non-moving party. **See Toy v. Metropolitan Life Ins. Co.**, 928 A.2d 186, 195 (Pa. 2007). Any question as to whether there exists a genuine issue of material fact must be resolved against the moving party, and the right to summary judgment must be "clear and free from all doubt." **Id**.

Meyers had presented no evidence of reputational harm, a necessary element of defamation. *Id*. at 16.[6]

As to the false light claim, the trial court found that none of the subject statements had been publicized to an extent necessary to create an issue of fact for the jury. *Id*. at 19. Moreover, the Meyers had "assumed the risk" of damaging responses by posting on CGS's message board and inviting Nelson to respond. *Id*. This appeal followed.[7]

## II.

On appeal, the Meyers contend that the statements at issue communicated to third parties that they re-created rather than restored comic books. The Meyers argue that those statements are defamatory because they suggested the Meyers are incompetent and lacking in integrity in the conduct of their business. According to the Meyers, the underlying premises of the statements are objectively false. In their brief, CGC, CCS, Nelson and Heritage contend that the orders of summary judgment should be affirmed

---

[6] It is unnecessary to recount the trial court's rulings as to the remaining counts in the Meyers' complaint because they are not at issue in this appeal.

[7] On appeal, "an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion." ***Weaver v. Lancaster Newspapers, Inc.***, 926 A.2d 899, 902–03 (Pa. 2007) (internal citations omitted). A de novo standard of review applies as to whether there exists an issue of material fact, as this presents a pure question of law. *Id*. Appellate review in this context must be done in the context of the entire record. *Id*. at 903.

because, as discussed in the trial court's opinion, all of the statements at issue are true and, therefore, not actionable.[8]

Before we address the merits, a short review of the law of defamation is needed.

## III.

## A.

"Defamation is a communication which tends to harm an individual's reputation so as to lower him or her in the estimation of the community or deter third persons from associating or dealing with him or her." ***Elia v. Erie Ins. Exch.***, 634 A.2d 657, 660 (Pa. Super. 1993); ***see Bell v. Mayview State Hosp.***, 853 A.2d 1058, 1062 (Pa. Super. 2004) (same).

In an action for defamation, the plaintiff has the burden of proving:

(1) The defamatory character of the communication; (2) Its publication by the defendant; (3) Its application to the plaintiff; (4) The understanding by the recipient of its defamatory meaning;

---

[8] CGC, CCS, Nelson and Heritage also argue in the alternative and for the first time on appeal that no Pennsylvania court has personal jurisdiction over them. ***See*** Appellees' Brief, at 34-35. However, "personal jurisdiction is readily waivable." ***Grimm v. Grimm***, 149 A.3d 77, 83 (Pa. Super. 2016) (quoting ***In re Estate of Albright***, 545 A.2d 896, 902 (Pa. Super. 1988)); ***see also Fletcher–Harlee Corp. v. Szymanski***, 936 A.2d 87, 103 (Pa. Super. 2007) (issue relating to personal jurisdiction waived for failure to comply with applicable rules of court). These parties did not object to personal jurisdiction at the trial level; so they have already acquiesced to the court's authority over them in this case. Although they assert in their brief that personal jurisdiction in Philadelphia County was based on a single factual claim which the Meyers have since abandoned, nothing precluded them from taking up the issue prior to when this appeal was filed; so the issue cannot be addressed for the first time here.

- 12 -

(5) The understanding by the recipient of it as intended to be applied to the plaintiff; (6) Special harm resulting to the plaintiff from its publication; [and] (7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343(a).

A defendant may prevail against a plaintiff in a defamation suit by proving: "(1) The truth of the defamatory communication; (2) The privileged character of the occasion on which it was published; [and] (3) The character of the subject matter of defamatory comment as of public concern." *Id*. at § 8343(b).

The possibility of reputational harm from a statement must be examined in full context. *See id.* "The nature of the audience is a critical factor" in this assessment. *Dougherty v. Boyertown Times*, 547 A.2d 778, 783 (Pa. Super. 1988).

**B.**

While the general elements of defamation are straightforward, the law is less clear as to when a communication expresses an opinion or a statement of fact. Pennsylvania has adopted the Second Restatement's approach to defamation,[9] and it distinguishes a statement of fact from a statement of opinion by whether it can be "objectively determined." Restatement (Second) of Torts, § 566, Comment (a). A statement of fact can be verified as true or

---

[9] *See Krajewski v. Gusoff*, 53 A.3d 793, 805-06 (Pa. Super. 2012).

false, whereas an expression of opinion only conveys a subjective belief of the speaker. *Id*. at § 566, Comment (a); *see also Milkovich v. Lorain Journal Co*., 497 U.S. 1, 21 (1990) (quoting *Scott v. News-Herald*, 496 N.E.2d 699, 707 (Ohio. 1986)) ("Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event.").[10]

As clarified in Comment (b) of Section 566, expressions of opinion fall into two sub-categories:

> (1) The pure type – which "occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character."
> (2) The mixed type – which "while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. Here the expression of opinion gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant."

*Dougherty*, 547 A.2d at 476-77 (quoting Restatement (Second) of Torts, § 566, Comment (b)); *see also Braig*, 456 A.2d at 1373 (quoting *Beckman v. Dunn*, 419 A.2d 583, 587 (Pa. 1980)) (Comments may take the form of a "mixed" expression of fact and opinion where the statement is made on the

---

[10] Whether construed as an expression of fact or opinion, a statement is defamatory if it "contained a demonstrably false 'factual connotation.'" *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 21 (1990) (explaining that the inquiry is whether a statement is "sufficiently factual to be susceptible of being proved true or false" with reference to "a core of objective evidence.").

basis "of undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion.").

Comment (c) of Section 566 fleshes out the purpose of categorizing speech in this manner:

> A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. *But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently*. The difference lies in the effect upon the recipient of the communication. In the first case, the communication itself indicates to him that there is no defamatory factual statement. In the second, it does not, and *if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability*. The defendant cannot insist that the undisclosed facts were not defamatory but that he unreasonably formed the derogatory opinion from them. *This is like the case of a communication subject to more than one meaning*. As stated in § 563, the meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express.

Restatement (Second) of Torts, § 566, Comment (c) (emphases added); *see also Dougherty*, 547 A.2d at 477; *Veno v. Meredith*, 515 A.2d 571, 575 (Pa. Super. 1986) (a pure expression an opinion "is actionable only if it may reasonably be understood to imply the existence of *undisclosed* defamatory facts justifying the opinion.") (emphasis in original); *Kurowski v. Burroughs*, 994 A.2d 611, 618 (Pa. Super. 2010) (when the facts underlying the opinion are both true and fully disclosed, the opinion is not defamatory as a matter of law, regardless of whether the opinion is "annoying and

embarrassing" to the plaintiff) (citing **Neish v. Beaver Newspapers, Inc.**, 581 A.2d 619, 622–24 (Pa. Super. 1990)).[11]

The United States Supreme Court has distilled this concept yet further, explaining that a speaker does not become immune from liability merely by couching a statement as an "opinion":

> Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications[.]

**Milkovich**, 497 U.S. at 18-19.

Accordingly, and as held by Pennsylvania courts, a statement qualified by the speaker as being only an opinion may nevertheless be considered a statement of fact if it could "reasonably be interpreted" as such by the audience. **See Braig v. Field Communications**, 456 A.2d 1366, 1373 (Pa. Super. 1983). An opinion can be defamatory if is misleading or based on undisclosed facts which are not true. **Id**.

Whether a statement constitutes an opinion or a statement of fact is a question of law for a court to determine in the first instance. **See Mathias v.**

---

[11] A heightened standard applies where the plaintiff is a public official or public figure, in which case it must be shown that the defendant published a statement with "actual malice," which is defined as having "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." **Curran v. Philadelphia Newspapers, Inc.**, 546 A.2d 639, 642 (Pa. Super. 1988). This standard does not apply in the present case because the Meyers are not alleged to be public figures.

*Carpenter*, 587 A.2d 1, 3 (Pa. Super. 1991). Once a court determines that a statement can be construed as potentially defamatory, depending on the kind of statement at issue, the jury then resolves whether the plaintiff can prove the elements of defamation and whether the defendant can prove the truth of the statement. *See Kurowski*, 994 A.2d at 616 ("If the court determines that the communication is capable of a defamatory meaning, it then becomes the jury's function to decide whether it was so understood by those who read it."). "In determining whether the challenged communication is defamatory, the court must decide whether the communication complained of can fairly and reasonably be construed to have the libelous meaning ascribed to it by the party." *Id*. at 617.

**C.**

**1.**

Applying the above standards to this case, if Nelson made a derogatory statement about the Meyers based on false and defamatory facts, he is subject to liability for those statements, even if expressed as an opinion. The crux of the subject posts on the CGC message board was a claim that the Meyers were "re-creating" valuable comic books and passing them off as "restored." Nelson noted that CGC was about to stop grading the Meyers' comic books due to "issues with the work," such as their suspected use of too much "color touch" on covers and concealing a "glossing agent." Nelson stated, or at least implied, that the Meyers had only received non-professional gradings of "B"

- 17 -

or "C" for work submitted to CGC, which could have been misleading in light of the numerous "A" grades the Meyers had gotten from CGC in the past.

Readers could have understood Nelson to be pronouncing as a statement of verifiable fact that the Meyers did not do professional level restoration. Worse, they could have understood Nelson to be insinuating that the Meyers were defrauding their buyers. For similar reasons, Nelson's verbal remarks to buyers and brokers could have reasonably been interpreted as defamatory statements of fact or expressions of opinion. By telling those individuals that the Meyers' work was "re-creation" and that their restorations felt "thick" or "like cardboard," Nelson could have been understood as making an accusation of fraud or incompetence against the Meyers. At least one buyer seemed to interpret Nelson's comments in a potentially defamatory context, prompting him to demand a refund from the Meyers on a recent purchase.

Moreover, Nelson admitted that he did not have a full understanding of the Meyers' techniques and, without providing any figures or dates, Nelson suggested on the message board that the Meyers had produced too many "high grade" issues in a short span of time. In other words, Nelson thought the work was too good to be true, leaving readers to wonder what exactly the Meyers had done to hide the character of their work. Nelson also directly contradicted the Meyers' claims that they achieved consistently high grades due to the sheer amount of time they put into each project rather than the use of disreputable methods.

What all of this shows is that there exists a genuine issue of material facts as to whether the subject posts on the CGC message board[12] and the verbal statements to third parties were based on true facts. A trier of fact could determine that all of the subject communications were either statements of fact not verified to be true or mixed opinions based on misleading or undisclosed defamatory facts. *See Milkovich*, 497 U.S. at 18-19; *Braig*, 456 A.2d at 1373; *Beckman*, 419 A.2d at 587. Summary judgment was improper because if the facts underlying a statement "are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *See Milkovich*, 497 U.S. at 18-19. Thus, since the truth of the subject statements is in dispute, a jury should resolve that genuine question of fact and determine if the Meyers can prove the elements of defamation enumerated in 42 Pa.C.S. § 8343(a), and if the Nelson/CGC/CCS can prove the elements of 42 Pa.C.S. § 8343(b).

_____

[12] As an agent of CGC and CCS, Nelson's statements clearly may be imputed to those corporate entities. CGC argues that it has no liability for statements posted on its message board under the Communications Decency Act, 47 U.S.C. § 230. *See* Appellees' Brief, at 53-55. The Act shields a provider of an interactive computer service from liability for content posted on the online service, but only if the service provider did not itself generate the content. The content at issue here was provided by Nelson, in his capacity as a member of CGC, so CGC was both a service provider and a provider of the subject content, making the Act inapplicable.

**2.**

With respect to the defamation claim against Heritage, the trial court also erred in granting summary judgment. *See* Trial Court Opinion, 5/8/2019, at 18. Almost all of the subject statements were internal communications between Heritage employees. They alluded to unsubstantiated claims that the Meyers had "reprinted" covers or trimmed pages, leading to the decision of Heritage to cease the auctioning of the Meyers' work. Such communications alone are not defamatory for lack of publication to a third party, as the Meyers acknowledge. However, the Meyers identified evidence that the content of those messages was somehow disclosed to third parties. Users on CGC's online message board and acquaintances of the Meyers apparently knew of and referred to Heritage's decision not to auction their work.

More specifically, James Lonergran Allen, a Heritage employee, commented to a third-party dealer at a New York convention in 2016 that a comic book restored by the Meyers was "fake." *See* Response in Opposition to Motion for Summary Judgment, at Exhibit "I," at 41. Even though the dealer convinced Allen that the work was properly restored, and Allen agreed that Heritage would auction it, the statement was still published and defamatory *per se*. *See* Restatement (Second) of Torts §570 (false statements that have detrimental effect on "the plaintiff's fitness to conduct business" are defamation *per se*, making it unnecessary for plaintiffs to prove special damages.). Moreover, the fact that Allen spoke of Heritage's position

to third parties supports the Meyers' claim that the substance of the Heritage emails was revealed to the public.  In light of this evidence of publication to third parties, the trial court erred in granting summary judgment on the count of defamation as to Heritage.

**D.**

The orders of summary judgment as to the false light claim must also be reversed.  The tort is defined as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts, § 652E; *Neish v. Beaver Newspapers, Inc.*, 581 A.2d 619, 624 (Pa. Super. 1990) ("a publication is actionable if it is not true, is highly offensive to a reasonable person and is publicized with knowledge or in reckless disregard of its falsity").  "[U]nlike the law of defamation . . . false light invasion of privacy offers redress not merely for the publication of matters that are provably false, but also for those that, although true, are selectively publicized in a manner creating a false impression." *Krajewski v. Gusoff*, 53 A.3d 793, 806 (Pa. Super. 2012).

Here, the trial court found that none of the statements made by Nelson and Heritage employees to third parties was sufficiently publicized for the

purposes of a false light claim. **See** Trial Court Opinion, 5/8/2019, at 18-19. The trial court also ruled that the Meyers had "assumed the risk" of the statements posted on CGC's message board by entering the fray with their own posts. **Id**.

As discussed above, the statements at issue here are potentially harmful to the Meyers' reputations and standing within their industry. The statements, or the reasonable implications of the statements, have not been proven true. Pennsylvania does not recognize "assumption of risk" as a defense to a false light claim, and regardless, the case facts in no way suggest that the Meyers ever invited a defamatory comment about themselves. Although statements spoken to a third party may not constitute "publication" for the purposes of the tort of false light, there is evidence in the record that those same defamatory statements by CGC, CCS, Nelson and Heritage were publicly disseminated on CGC's message board and elsewhere. Thus, the trial court's orders of summary judgment as to the false light claims cannot stand.

Reversed in part, affirmed in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/18/19